**In the Matter of the Termination of the Parent-Child Relationship of J.K.C. and S.R.C., Children, and Mary (Carpenter) Howard, The Childrens' Parent, Respondent-Appellant,**

v.

**FOUNTAIN COUNTY DEPARTMENT OF PUBLIC WELFARE, Petitioner-Appellee.**

**No. 1–1283A407.**

Court of Appeals of Indiana, First District.

Oct. 31, 1984.

Richard A. Kordys, Holmes & Kordys, Covington, for respondent-appellant.

John L. Shambach, Wallace, Campbell, Bunch, Shambach & Rennick, Covington, for petitioner-appellee.

## MEMORANDUM DECISION

NEAL, Presiding Judge.

### STATEMENT OF THE CASE

Respondent-appellant, Mary Carpenter Howard (Mary), appeals from a judgment of the Fountain Circuit Court terminating her parental rights as the natural mother of two minor children, S.C. and J.C.

### STATEMENT OF THE FACTS

The Fountain County Department of Public Welfare (DPW) filed a petition alleging S.C. and J.C. to be children in need of services on June 7, 1982. An initial hear-

ing was conducted on June 18, at which time counsel was appointed to represent Mary and a fact finding hearing was scheduled for July 22. Mary did not personally appear at the July 22 hearing and S.C. and J.C. were adjudged to be children in need of services and made wards of the DPW. Mary, her husband Sam Howard (Sam), S.C. and J.C. were living in Kentucky at this time. S.C. and J.C. were turned over to authorities in Kentucky and thereafter transported to Indiana where they resided in Fountain County with Millie and Casey Roarks, their appointed foster parents.

On August 12, 1982 Mary requested the trial court to reconsider its wardship order. A hearing was scheduled for October 19. Mary contacted the DPW by telephone from her home in Kentucky on October 19 but did not appear at the hearing. The trial court denied Mary's request to reconsider its wardship order, reaffirming its July 22 decision.

In April of 1983, the Kentucky Department of Social Services made a home visit to the trailer where Mary and Sam were living. The DPW conducted a case review of the situation of S.C. and J.C. on February 28, 1983. Notice of this administrative review and a case plan was mailed to Mary in Kentucky, however, she never received it because she had moved.

On May 24, 1983 the DPW filed a petition to terminate Mary's parental rights as to S.C. and J.C.[1] Another case review was planned for August 26 and notice was mailed to Mary at her new address in Danville, Illinois. Following the birth of their child in the summer of 1983, Mary and Sam had moved back to the Fountain County area. Although Mary did not attend the case review, she visited the DPW office the afternoon of August 26.

In September of 1983, Mary and Sam rented a large house in Danville which they shared with their child, Mary's mother, Sam's sister, her boyfriend and five children. A representative of the DPW visited this home on September 26 and reported that it was inadequate to house two addi-

---

1. A previous motion to terminate her parental rights had been denied in 1981.

tional persons. On September 29, 1983 a hearing was conducted and the trial court terminated Mary's parental rights as to S.C. and J.C.

## ISSUES

Mary presents three issues for our review:

I. Was there clear and convincing evidence to support the trial court's finding and judgment terminating the parent-child relationship of Mary to S.C. and J.C. that there was a reasonable probability that the conditions that resulted in their removal from her custody would not be remedied?

II. Was there clear and convincing evidence to support the trial court's finding and decree that the termination of the parental rights of Mary was in the best interest of S.C. and J.C.?

III. Did the DPW prove by clear and convincing evidence a satisfactory plan for the care and treatment of S.C. and J.C.?

## DISCUSSION AND DECISION

▇▇ Mary's arguments follow the requirements of IND.CODE 31–6–5–4 for involuntarily terminating one's parental rights. The DPW must present clear and convincing evidence to support the elements of IND.CODE 31–6–5–4. *Ellis v. Knox County Department of Public Welfare*, (1982) Ind.App., 433 N.E.2d 847. In determining whether the trial court's decision to terminate Mary's parental rights regarding S.C. and J.C. was supported by clear and convincing evidence, we may not reweigh the evidence or judge the credibility of the witnesses; we may only consider that evidence most favorable to the judgment. *Matter of Lozier*, (1983) Ind.App., 453 N.E.2d 345.

The evidence shows that S.C. and J.C. were wards of the DPW from August 1979 through July 1981. Eleven months after they were returned to Mary, S.C. and J.C. again became wards of the DPW and have remained such to date. J.C., who was born in February of 1979, has spent the vast majority of his life in a foster home. S.C. is one and a half years older than J.C.

Mary has been married to Sam for four years, during which time they have lived as transients. During the eleven months that S.C. and J.C. spent with Mary and Sam, beginning in August of 1981, the four of them resided in two rooms of an elderly woman's home. Upon her death they moved into a friend's overcrowded house. Mary and Sam slept in their car while the two children shared a bed with several other people. Sam had previously worked at a garden center but that job had terminated.

After the four moved to Kentucky and S.C. and J.C. had been removed from Mary's custody, she requested that the DPW authorize Kentucky officials to inspect her home. The Kentucky Department of Social Services agent visited the Howards in April of 1983. She found Mary and Sam living gratuitously in a small mobile home owned by Sam's brother-in-law. There was no running water in the trailer, Sam and Mary got their drinking water in town and used rain water to wash themselves and their clothes. There was one double bed but Mary stated another could be put in the living room if that room's furniture was removed. Mary was pregnant at that time and due to deliver in July of 1983. The Howards had no current income, although Sam had earlier worked on a local tobacco farm, and they received a small amount of food stamps. The agent concluded, "the Howards can barely subsist themselves, and I see no possible way that they could provide adequate care for [S.C. and J.C.]. Their prospects for doing so in the future also seem almost non-existent". Mary stated she and Sam later moved into a larger trailer which the Kentucky agent approved of; however, no report of this visit is found in the record.

Following the birth of Sam and Mary's son in the summer of 1983, they moved to Danville, Illinois where the three of them lived with Sam's sister, her boyfriend and

five children. The next month Mary informed the DPW that she and Sam had rented a two-story house where they lived with their son, Mary's mother, Sam's sister, her boyfriend and five children.

The DPW agent testified as to the condition of the house stating:

"Mary showed us the house. It was not clean. It was—the kitchen, the table had food and water and things strung all over the table. She took us upstairs, up a dark stairway that was lit[t]ered with trash and things that didn't look like it had been swept for some time. She showed us a bed where she and Sam slept. She showed us another bed where some of the other people who were staying there slept and there was a bed downstairs that she said was for her mother."

Upon their move to Danville, Mary spent a short period of time in the Shelter Care Facility following a fight with Sam when he hit her. Although the shelter offered to help her find housing and obtain financial assistance for herself and her children, Mary returned to Sam.

Mary argues the DPW has not proved the circumstances which led to the removal of S.C. and J.C. from her home would not be remedied. We believe clear and convincing evidence was presented to show a reasonable probability that these detrimental conditions will not change. *See Matter of VMS*, (1983) Ind.App., 446 N.E.2d 632.

The DPW stated as reasons for the removal of S.C. and J.C. from Mary's custody:

"[T]hat said childrens' physical and mental condition were seriously impaired and seriously endangered as the result of the inability, refusal and neglect of their mother to supply said children with necessary food, clothing, shelter, medical care, education and supervision, and that said children needed care, treatment and rehabilitation that they were not receiving, and that was unlikely to be provided or accepted without the coercive intervention of the court."

This situation arose from the infrequent employment of either Mary or Sam, the constant uprooting and relocation of their residence and their seeming lack of concern regarding the importance of a stable, orderly homelife during a child's developmental years. Condensed, the evidence shows that over a two year period Mary and Sam moved a minimum of five times, most recently one month before the termination hearing. During this time Sam had worked at three different jobs while Mary remained unemployed. Mary testified that while in Kentucky Sam worked about half of the time. Sam was doing odd jobs for their landlord at the time of the hearing and although Mary and her mother testified he could work as long as he wanted, there was no evidence of a permanent job arrangement or contract.

All of the previous living arrangements of Mary and Sam had been alms from various friends and relatives. Although they are now renting the house they live in, the overcrowded conditions and dearth of privacy and living space are still present. The DPW agent observed only three beds in Mary and Sam's most recent home where eleven people are now living. If S.C. and J.C. are returned to Mary, the ratio will be greater than four persons per bed.

▮▮▮ Mary is correct in stating the trial court should judge a parent's fitness to care for her children as of the time of the termination hearing, taking into consideration evidence of changed conditions. *Wardship of Bender*, (1976) 170 Ind.App. 274, 352 N.E.2d 797. However, recognizing the permanent effect of termination we have stated the court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *Matter of Perkins*, (1976) 170 Ind.App. 171, 352 N.E.2d 502. Examining Mary's pattern of living and her current lifestyle, there is sufficient evidence from which the trial court could find there is no reasonable probability the circum-

stances which led to the removal of S.C. and J.C. from Mary's custody will change.

Mary next argues there was insufficient evidence to prove that termination of Mary's parental rights was in the best interest of S.C. and J.C. We disagree. In making the "best interest of the children" determination the trial court is required to look beyond factors identified by the DPW to the totality of the evidence. *Matter of Fries,* (1981) Ind.App., 416 N.E.2d 908. Children are not removed from the custody of their parents because there is a better place for them, but because the situation while in the custody of their parents is "wholly inadequate for their very survival". *Matter of Miedl,* (1981) Ind., 425 N.E.2d 137, 141. This is a graduated yardstick according to which the particulars of a case must be measured. In so doing, the trial court must subordinate the interests of the parents to those of the children involved. *Matter of Perkins, supra.* It need not wait until the children are irreversibly influenced by their deficient lifestyle such that their physical, mental and social growth is permanently impaired before terminating the parent-child relationship.

In the present case, J.C. has lived with Mary only 17 months out of his five-year-old life. S.C. knows and remembers her mother only slightly better. Following their return to the foster home where they've spent the majority of their lives, S.C. and J.C. received two phone calls and no letters from Mary. Thus, neither S.C. or J.C. has had an opportunity to form a strong emotional bond with their mother. This is illustrated by their foster mother's testimony that during their one visit with their mother in August of 1983 S.C. and J.C. behaved shyly and with reserve. Life with Mary was constant upheaval, presenting none of the stability necessary for normal social development of a child. Both S.C. and J.C. are of school age now. They need the reassurance that one single family home, one school and one set of friends brings to a grade school child. Proper development of a child also requires the influence and presence of a significant adult, the knowledge that his next meal has been provided for and that he has his own place to sleep at night. The absence of these security factors led to S.C.'s and J.C.'s removal from Mary's custody. There is no evidence of a change in Mary's way of life which will insure a solid home and family life for S.C. and J.C., complete with the necessities of food and clothing. In light of all the evidence presented at the hearing, the trial court's decision that termination of Mary's parental rights was in the best interest of S.C. and J.C. was not erroneous.

Finally, Mary argues the DPW did not prove by clear and convincing evidence a satisfactory plan for the care and treatment of S.C. and J.C. The DPW stated its intention was to place S.C. and J.C. for permanent adoption. The evidence shows that as wards of the DPW, S.C. and J.C. have been maintained together in the same foster home, where they have led a stable life and have begun their schooling. This is sufficient to support its burden of proof. When the legislature drafted IND. CODE 31–6–5–4, it did not intend that the DPW would completely detail the children's future. Rather, the DPW should "point out in a general sense to the trial court the direction in which its plans were going". *Matter of Miedl, supra* at 141. The DPW accomplished this.

For the above-stated reasons, this cause is affirmed.

Judgment affirmed.

ROBERTSON and RATLIFF, JJ., concur.