**In the Matter of the ADOPTION OF D.V.H.**

**S.L., Appellant–Respondent Below,**

v.

**MARION COUNTY DEPARTMENT OF PUBLIC WELFARE, Appellee–Petitioner Below.**

**No. 49A04–9201–CV–25 [1].**

Court of Appeals of Indiana, Third District.

Dec. 9, 1992.
Transfer Denied Feb. 11, 1993.

**1.** This case was diverted to this office by order of the Chief Judge.

I. Marshall Pinkus, Zinkan O'Hara & Pinkus, Indianapolis, for appellant.

Elizabeth G. Filipow, Indianapolis, for appellee.

STATON, Judge.

In this consolidated appeal, S.L. ("Mother") challenges an order of the Marion County Superior Court, Juvenile Division (terminating her parental rights in D.H.) and an order of the Marion County Superior Court, Probate Division (denying Mother Petition to Intervene and to Set Aside Adoption). Mother presents four issues for review:

I. Whether there exists clear and convincing evidence to support the termination of Mother's parental rights.

II. Whether the trial court should have continued foster care placement in lieu of termination of Mother's parental rights.

III. Whether the trial court erroneously admitted hearsay testimony.

IV. Whether the probate court erroneously denied Mother's Petition to Intervene and Set Aside Adoption.

We affirm.

Mother suffers from a borderline personality disorder, which has precipitated Mother's hospitalization on numerous occasions throughout her adolescence and adulthood. On May 15, 1985, Mother gave birth to D.H. Unable to care for D.H. on a daily basis, Mother placed D.H. in the care of her former foster mother, E.W.

On March 23, 1987, the Marion County Department of Public Welfare ("DPW") filed a petition alleging Mother's inability to adequately supervise D.H. and provide for his physical needs. On February 4, 1988, D.H. was found to be a child in need

of services; he remained in E.W.'s care. On June 5, 1989, the DPW filed a petition to terminate Mother's parental rights. Hearing was held on March 12 and 13, 1991; the petition was granted on August 29, 1991.

On August 30, 1991, E.W. filed a petition for adoption of D.H. in the Marion County Superior Court, Probate Division. The probate court issued a decree of adoption on September 12, 1991. On September 23, 1991, Mother filed a Motion to Set Aside the Adoption; she subsequently filed a motion for injunctive relief and a petition to intervene. All pending motions were denied by the probate court on October 7, 1991. This appeal ensued.

## I.

### *Sufficiency of the Evidence*

The time-honored right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *In the Matter of Tucker* (1991), Ind.App., 578 N.E.2d 774, 778, *trans. denied* (quoting *Pierce v. Society of Sisters* (1925), 268 U.S. 510, 534, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070; *Meyer v. State of Nebraska* (1923), 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042). However, these parental interests are not absolute and must be subordinated to the child's interest in determining an appropriate disposition of a petition to terminate parental rights. *In the Matter of Perkins* (1976), 170 Ind.App. 171, 181, 352 N.E.2d 502, 509, *reh. denied, trans. denied.*

To effect the involuntary termination of a parent-child relationship, the DPW must present clear and convincing evidence to establish the elements of IND.CODE 31–6–5–4(c):

(1) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(2) there is a reasonable probability that:
(A) the conditions that resulted in the child's removal will not be remedied; or
(B) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(3) termination is in the best interests of the child; and

(4) there is a satisfactory plan for the care and treatment of the child.

 The trial court should judge a parent's fitness as of the time of the termination hearing, taking into consideration evidence of changed conditions. *J.K.C. v. Fountain County DPW* (1984), Ind.App., 470 N.E.2d 88, 92. The parent's habitual patterns of conduct must be evaluated to determine whether there is a substantial probability of future neglect or deprivation. *Id.* When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. We will consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Egly v. Blackford County DPW* (1992), Ind., 592 N.E.2d 1232, 1235.

 During the years that D.H. was under a dispositional decree as a child in need of services, caseworkers from Visiting Nurses Services, Family Works and Family Connections supervised Mother's visits with D.H. and counseled Mother as to appropriate parent-child interaction. However, caseworker Vicki Gleissner testified that these services produced limited progress over the years. Record, p. 452. Moreover, Mother refused joint counseling with D.H.'s foster mother.

Dr. James Brown of Midtown Mental Health Crisis Intervention Unit testified that Mother had been treated at the crisis center since 1988. Mother was diagnosed as suffering from borderline personality disorder, characterized by unstable interpersonal relationships, an unstable self identity and pervasive instability of moods (for example, unprecipitated severe anxiety and severe depression). Mother's second-

ary diagnoses included bulimia, major depression and obsessive compulsive neurosis. Record, pp. 472–75. Dr. Brown indicated that Mother had made "average" progress in counseling despite above-average severity of symptoms, but continued to engage in self-mutilation. He indicated that the recommended treatment of Mother's disorder "is years in duration" and would "very likely" require brief periods of hospitalization in the future upon the occurrence of "overwhelming depression or suicidal urges." Record, pp. 481, 495–96.

Sue Cardea, Mother's primary therapist, testified that Mother's significant symptomology had remained the same during her years of treatment. Record, p. 538. These symptoms include intense anxiety, self-destructive acts,[2] bulimia, depression, panic attacks and cognitive distortions. When asked to characterize Mother's current emotional state, Cardea responded:

"She's unstable. You know, what can I say. She's ... there are moments when she's fine. They are very short-lived. It's hard to describe because, I mean, you're talking degree. She's not always raging and screaming and whatever."

Record, p. 547

Cardea also related the circumstances of Mother's current lifestyle: involvement in an abusive marriage, housing difficulties, and erratic job attendance because of a compulsion to leave her work site and "go home and confess to her husband." Record, p. 544. Cardea opined that Mother was unable to care for D.H. on a full-time basis as of the time of the hearing. Record, p. 574.[3]

Dr. Richard Lawler, a clinical child psychologist, testified that long term foster care poses certain risks for the foster child. He emphasized the child's need for stability and permanence to facilitate interpersonal intimacy and bonding. Additionally, he opined that repetitive court proceedings involving a child were disruptive and provoked anxiety (particularly in the case of a

---

**2.** Ms. Cardea testified: "She typically cuts her arms up or scratches them deeply or something." Record, p. 539. Mother had reported to Cardea her January 1991 hospitalization resulting from a self-inflicted cut to her stomach. Record, p. 595.

**3.** Cardea elaborated: "I think [Mother] could be trusted alone with her child for periods of time up to a couple of hours.... Unsupervised.... I have no reason to think that she would hurt her child in any way.... She is likely to play very childlike with him." Record, pp. 574–5.

child having the perceptive skills of a child of age 7 or older). Record, pp. 810–816.

Dr. Robert TenEyck, who had conducted a psychological evaluation of D.H., opined that D.H.'s primary bond was with E.W. and that removal from E.W.'s care would be a "disaster."[4] Record, pp. 853–54. He further opined that attempts to strengthen the bond between D.H. and Mother would not be in D.H.'s best interests. Dr. TenEyck cautioned that it would be "very destabilizing" to D.H. should he observe Mother's self-abusive behaviors. Record, p. 863. Finally, D.H.'s guardian ad litem—relying upon her interview with D.H. and her review of available records—recommended the termination of Mother's parental rights. Record, p. 1008.

The DPW plan for D.H.'s future consisted of adoption by his foster mother, with whom D.H. had lived almost continuously since his birth. D.H.'s caseworkers testified that E.W. was cooperative with case plans and interacted appropriately with D.H. (who had special needs due to hyperactivity and aggressive behaviors).

The DPW established by clear and convincing evidence that: D.H. was removed from Mother for several years pursuant to a dispositional decree, a reasonable probability exists that the conditions leading to the removal will not be remedied, termination of parental rights is in D.H.'s best interests and a satisfactory plan for D.H.'s care was devised, i.e., adoption by his long-term foster mother.

## II.

### Continuation of Foster Care Placement

■ Mother next contends that the trial court should have elected to continue D.H.'s status as a foster child, without issuing an order terminating parental rights. She points to E.W.'s testimony that she would be willing to continue to act as D.H.'s foster mother if Mother's parental rights were not terminated. Essentially, Mother restates her claim that the termination of her parental rights was not in D.H.'s best interests.

The DPW presented expert testimony that long-term foster care is unadvisable inasmuch as a child needs permanency and stability. Record, p. 808. Moreover, Dr. TenEyck opined that D.H. is an "at risk" child who needs to know that his primary relationship will not be disrupted in the future. Record, pp. 855, 860.

■ The purpose of terminating parental rights is not to punish parents, but to protect the children involved. Egly, supra, at 1234. The court need not wait until the children are irreversibly harmed such that their physical, mental and social development is permanently impaired before terminating the parent-child relationship. J.K.C., supra, at 93. A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that continuation of the parent-child relationship is contrary to the child's best interests. B.R.F. v. Allen County D.P.W. (1991), Ind.App., 570 N.E.2d 1350, 1352. See also S.E.S. v. Grant County Dept. of Welfare (1991), Ind.App., 582 N.E.2d 886.

The trial court was not required to enter an order continuing D.H.'s foster child status in lieu of the termination of Mother's parental rights.

## III.

### Testimony of Guardian Ad Litem

■ During the testimony of guardian ad litem Jan Fleener, Mother moved to strike as hearsay the following response:

Q: Ms. Fleener, could you summarize, based upon your interview with [D.H.] and your assessment, what you observed his wishes to be?

A: Yes. [D.H.] made it very clear to me that he did not want to have any ongoing contact with his mother, that he

4. Dr. TenEyck also opined: "I'd worry about the potential for destabilizing his [D.H.'s] whole, his view of things and so on if he were to have to

have his status reviewed every six months." Record, p. 862.

wanted to remain in E.W.'s home, in her care, forever. And that E.W. was, in his mind, his mother.

Record, p. 1004.

The trial court instructed the guardian ad litem to refrain from repeating verbatim statements made by D.H. However, he observed that IND.CODE 31–6–3–4 (providing for the appointment of a guardian ad litem to represent the child's interests) contemplates some summarization of the child's desires and state of mind. We agree, and find no abuse of discretion in the admission of Fleener's testimony.

### IV.

#### Denial of Motion to Intervene and Set Aside Adoption

 On September 23, 1991, Mother moved to set aside the adoption of D.H., contending that the order was improper inasmuch as she received no notice of the probate court proceeding. She claims a due process right to such notification.

Contrary to Mother's assertion, the adoption was not invalidated by her lack of notice. IND.CODE 31–6–5–6(a) provides:

> "When the juvenile or probate court terminates the parent-child relationship, all rights, powers, privileges, immunities, duties, and obligations (including any rights to custody, control, visitation, or support) pertaining to that relationship are permanently terminated, and the parent's consent to the child's adoption is not required."

The trial court did not err in denying Mother's petition.[5]

BUCHANAN and CHEZEM, JJ., concur.

---

**5.** Mother also filed (in the trial court) a motion for a stay of the termination order pursuant to Ind.Trial Rule 62. She did not appeal the denial of this motion.