**Debra Hofferman KERN, Appellant–Respondent Below,**

v.

**Barbara WOLF, in her capacity as Court Appointed Special Advocate, Noble County Department of Public Welfare, Appellees–Petitioners Below,**

**and**

**Neal Frost, Appellee–Respondent Below.**
**No. 57A03–9210–JV–00342.**

Court of Appeals of Indiana,
Third District.

Oct. 14, 1993.

Latriealle Wheat, Wheat and Stout, Angola, for appellant.

Michael M. Yoder, Jeffrey W. Wible, Kendallville, for Barbara Wolf, in her Capacity as Court Appointed Sp. Advocate.

Dennis D. Graft, Graft & Owen, Kendallville, for Noble County Dept. of Public Welfare.

STATON, Judge.

Debra Kern ("Mother") appeals the termination of her parental rights in K.H., born December 22, 1984. Mother presents three issues for our review:

I. Whether IND. CODE 31-6-5-4, providing for the filing of a petition for the termination of parental rights by a court appointed special advocate, is unconstitutional.

II. Whether K.H.'s court appointed special advocate exceeded the authority granted by statute.

III. Whether the findings of the trial court are supported by clear and convincing evidence.

We affirm.

On March 1, 1989, caseworker Mona Briggs of the Noble County Department of Public Welfare ("DPW") received a report that four year old K.H. was required to ride in the back of a pick up truck for a distance of several miles in freezing weather as punishment for wetting her pants. Mother and her boyfriend, Brad Kern ("Kern"), appeared at the Kendallville police station for an informal interview; they were subsequently advised by DPW personnel to obtain therapy and parenting classes.[1]

On March 22, 1989, K.H. was hospitalized after suffering second degree burns to her legs, feet and ankles while in the care of Kern. K.H. had also sustained injuries including a large bruise under one eye, a bite wound and a hand imprint mark upon her ribs. On March 23, 1989, K.H. was found to be a child in need of services; she was placed in foster care upon her April 3, 1989 release from McCray Hospital.

During K.H.'s placement in foster care, Mother routinely exercised visitation with K.H. and participated in parenting classes and court-ordered counseling sessions.

Kern was enjoined from any contact with K.H. Nevertheless, Mother married Kern on February 10, 1990.

On May 1, 1991, Barbara Wolf, the court-appointed special advocate for K.H. (hereinafter "CASA"), filed a petition to terminate Mother's parental rights in K.H. On August 2, 1991, the DPW also filed a petition for termination of Mother's parental rights. Evidence was heard on April 8, 9 and 10, 1992. The petitioners asserted that the conditions that resulted in K.H.'s removal from her home had not been remedied, in that Mother had failed to take any action to protect K.H. from Kern. On July 23, 1992, the Noble Circuit Court entered an order terminating Mother's parental rights.

I.

*Constitutionality of I.C. 31-6-5-4*

I.C. 31-6-5-4(a) provides in pertinent part:

"A verified petition to terminate the parent-child relationship involving a delinquent child or a child in need of services may be signed and filed with the juvenile or probate court by: ... the child's court appointed special advocate[.]"

Mother contends that the foregoing statute is violative of the Fourteenth Amendment of the United States Constitution because it permits the initiation of a petition for termination of parental rights by a community volunteer rather than a state actor.[2]

■ Mother's challenge to the constitutionality of I.C. 31-6-5-4 is not properly before this court inasmuch as she failed to challenge the statute in the trial court. A constitutional question will not be considered on appeal unless it was presented in the trial court. *City of Indianapolis v. Wynn* (1959), 239 Ind. 567, 159 N.E.2d 572, 573.

---

1. K.H. was also interviewed by DPW personnel. She described the incident of being forced to ride in the back of the pickup truck with wet pants and also related an incident where she was held under water by Kern until she "almost drown." Record, p. 107.

2. IND.CODE 31-6-1-12 defines a court appointed special advocate as "a community volunteer who has completed a training program approved by the court and who has been appointed by a court to represent and protect the best interests of a child and to provide that child with services requested by the court."

## II.

### CASA's Alleged Violation of Statutory Authority

Mother claims that the CASA appointed to represent K.H. exceeded the statutory authority conferred upon her pursuant to I.C. 31–6–1–12 because the CASA vigorously pursued the termination action. Mother complains that counsel for CASA obtained depositions, summoned and examined witnesses and generally exercised a dominant role in the termination proceedings, with the DPW exercising a subordinate role.

A statute should be construed so as to ascertain and give effect to the intention of the legislature as expressed in the statute. In so doing, the objects and purposes of the statute in question must be considered as well as the effect and consequences of such interpretation. *State v. Windy City Fireworks, Inc.* (1992), Ind. App., 600 N.E.2d 555, 558, *adopted on transfer* (1993), Ind., 608 N.E.2d 699. We presume that the legislature intended its language to be applied in a logical manner consistent with the statute's underlying policy and goals. *Id.* We presume words appearing in the statute were intended to have meaning and we endeavor to give those words their plain and ordinary meaning absent a clear manifested purpose to do otherwise. *Indiana Dept. of Human Services v. Firth* (1992), Ind.App., 590 N.E.2d 154, 157, *trans. denied.*

Pursuant to I.C. 31–6–1–12, a CASA is empowered to "represent and protect the best interests of a child and to provide that child with services requested by the court." According to The American Heritage Dictionary (Second Edition), "represent" means, *inter alia,* "to serve as the official and authorized delegate or agent for"; "protect" is defined, *inter alia,* as "to keep from harm, attack, or injury; to guard." Ascribing to these terms their plain and ordinary meaning, we conclude that the CASA acted within statutory parameters when she took measures to pursue the termination of Mother's parental rights.

## III.

### Sufficiency of the Evidence

To effect the involuntary termination of a parent-child relationship, the petitioner must present clear and convincing evidence to establish the elements of I.C. 31–6–5–4(c):

(1) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(2) there is a reasonable probability that:

  (A) the conditions that resulted in the child's removal will not be remedied; or

  (B) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(3) termination is in the best interests of the child; and

(4) there is a satisfactory plan for the care and treatment of the child.

The trial court should judge a parent's fitness as of the time of the termination hearing, taking into consideration evidence of changed conditions. *J.K.C. v. Fountain County DPW* (1984), Ind.App., 470 N.E.2d 88, 92. The parent's habitual patterns of conduct must be evaluated to determine whether there is a substantial probability of future neglect or deprivation. *Id.*

When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. We will consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Egly v. Blackford County DPW* (1992), Ind., 592 N.E.2d 1232, 1235. Where the trial court has entered findings of fact and conclusions of law, we engage in a two-tier standard of review. First, we determine whether the evidence supports the findings; second, we determine whether the findings support the judgment. The trial court's findings and conclusions will be set aside only if they are clearly erroneous. *In the Matter of M.J.G.* (1989), Ind. App., 542 N.E.2d 1385, 1388.

In the instant case, the trial court made extensive findings of fact and conclusions of law to support the termination decision.

Mother challenges the sufficiency of the evidence in support of the following findings:

13. A psychological evaluation of Brad was performed by the Northeastern Center, Inc. Community Mental Health Center. The evaluation revealed that he has an explosive temper and difficulties with impulse control among a number of other problematic behaviors. The evaluation further reveals that improvement in his condition, if the same can be achieved at all, will require long term therapy. Brad's counseling and therapy have been sporadic and no progress has been made. Brad has gained no insight into his personal weaknesses, negative personality traits or needs. Brad's behavior and lack of progress in counseling is consistent with his personality type.

\*   \*   \*   \*   \*   \*

15. Brad, if in a position of parent figure or custodian, would be a serious threat to the physical and emotional well-being of [K.H.].

\*   \*   \*   \*   \*   \*

21. The length of time necessary to assure protection of [K.H.] and, at the same time, develop a relationship between [K.H.] and Brad, and to counsel Brad to assure his future proper care and treatment of [K.H.], if the same could ever be accomplished, would be of such an extent that the length of time that [K.H.] would be in an unsettled care status would be detrimental to her health and well-being.

Supp. Record, pp. 1049–51.

In support of her contention that the trial court entered deficient findings of fact, Mother alleges that the trial court "abused its discretion" in failing to obtain timely and adequate psychological counseling for Brad Kern. She further argues that the trial court emphasized the less favorable of two psychological reports regarding Kern which were ultimately obtained by the court. As stated herein, *supra*, we do not review a parental rights termination decision under an abuse of discretion standard. Rather, we look to the evidence most favor-able to the judgment and the reasonable inferences to be drawn therefrom to determine if the findings are supported by sufficient evidence. Moreover, we will not re-weigh the evidence or judge the credibility of the witnesses. *Egly, supra.*

■ Our review of the evidence most favorable to the judgment leads to the conclusion that the challenged finding concerning Kern's psychological profile has adequate evidentiary support.

Cynthia Pattillo, a former staff psychologist at Northeastern Center, testified that she prepared a personality assessment of Kern. Kern's evaluation suggested "significant" emotional problems and a poor prognosis for psychotherapy. Record, p. 208. In preparing the assessment, Dr. Pattillo relied in part upon reports compiled by therapist Orv Miller, who concluded that Kern lacked parenting skills, had a "quick temper" and exhibited poor impulse control.

Psychologist Paul Roberts administered a series of psychological tests to Kern and concluded in pertinent part:

"The prognosis for individuals of this nature is guarded to poor due to their inability to develop a socially-appropriate insight and problem-solving strategies. His emotional immaturity, coupled with his paranoid tendencies and self-absorbing nature, reduce the likelihood of significant behavior change...."

Record, p. 861.

Clinical social worker Richard Donovan, who acted as Kern's therapist subsequent to Orv Miller, testified that Kern had difficulty identifying his problem areas and blamed his problems on the "unfairness" of the welfare system. Record, pp. 289, 296, 300. Donovan indicated that Kern had extremely low insight and a history of poor management of anger. Record, p. 303. He opined that Kern should not be left alone with a child because of his diminished capacity to manage anger. Record, p. 306. Additionally, he opined that Kern needed long-term counseling. Record, p. 333.

Further, there is evidence in the record that Kern presented a threat to K.H.'s emotional well-being. Foster mother Rose

Gillespie testified that K.H. suffered nightmares after exposure to Kern during some of K.H.'s visits with Mother.[3] Moreover, when K.H. had encountered Kern in public places, she hid behind her foster mother and refused to walk past Kern. Record, pp. 157–61. Dr. Pattillo testified that K.H. would scream and refuse to talk about Kern during counseling sessions. Record, p. 212.

There also exists evidence to support the trial court's finding that Kern would present a physical threat to K.H. K.H. related to her foster mother, her therapists and the CASA incidents in which Kern had undressed her, touched her in "private places," laid unclothed on top of her and given "bad kisses." Record, pp. 162, 218, 417, 904. She repeatedly expressed anger and fear because Kern burned her. K.H. also reported that Kern "laid on top of me and went up and down and made me bleed." Record, p. 432.

Finally, there is evidence in the record to support the trial court's finding that K.H.'s safety in Mother's home could be ensured (if at all) only with long-term counseling. Dr. Pattillo concluded that satisfactory progress was not being made in her counseling sessions with Mother. Record, pp. 271, 275. She opined that progress in therapy had been impeded because Mother rejected evidence of Kern's abusive behavior toward K.H. She further opined that Mother was unable to protect K.H. in the face of her denial of any danger to K.H. Record, pp. 239, 242.

The findings of the trial court (considered as a whole) support the conclusion that the conditions which resulted in K.H.'s removal from Mother's home will not be remedied and that termination of Mother's parental rights is in K.H.'s best interests.

Affirmed.

HOFFMAN and GARRARD, JJ., concur.

---

**3.** Gillespie also testified that K.H. experienced nightmares after hearing someone talk about Kern. Record, p. 173.