**In the Matter of D.Q., A.Q., S.Q., Ke.Q., Ka.Q., and R.Q., Minor Children.**

**Marion County Office of Family & Children and Child Advocates, Inc., Appellants–Petitioners,**

v.

**Delpha Qualls and Steve Darringer, Appellees–Respondents.**

No. 49A05–0009–JV–373.

Court of Appeals of Indiana.

April 12, 2001.

---

Elizabeth G. Filipow, Indianapolis, IN, Attorney for Appellant Marion County Office of Family & Children.

Loretta A. Oleksy, Indianapolis, IN, Attorney for Appellant Child Advocates, Inc.

Katherine A. Cornelius, Marion County Public Defender Agency, Thomas D. Strodtman, Bamberger & Feibleman, Indianapolis, IN, Attorneys for Appellee Delpha Qualls.

## OPINION

NAJAM, Judge

### STATEMENT OF THE CASE

The Marion County Office of Family & Children ("OFC") and Child Advocates, Inc., the guardian ad litem, appeal from the trial court's denial of the OFC's petition for involuntary termination of the parental rights of Delpha Qualls and Steve Darringer.

We affirm in part and remand for further proceedings.[1]

### ISSUES

The OFC and Child Advocates present several issues for our review, which we consolidate and restate as:

1. Whether the trial court abused its discretion when it reopened the case to allow Qualls to present additional evidence.

2. Whether the trial court's judgment denying the petition for termination of Qualls' parental rights is contrary to law.

3. Whether the trial court's judgment denying the petition for termination

---

1. We also grant the OFC's and Child Advocates' motion to strike those portions of Qualls' appellate brief where she refers to medical journals addressing the physical and psychiatric manifestations of Graves' Disease, a hyperthyroid condition with which Qualls has been diagnosed. It is well settled that matters outside the record cannot be considered by the court on appeal. *Zapffe v. Srbeny,* 587 N.E.2d 177, 180 (Ind.Ct.App.1992), *trans. denied.* We must decide the case on the record before us and cannot speculate as to the actual facts of a case. *Id.* These medical journals were never a part of the record considered by the trial court in ruling on the petition to terminate Qualls' parental rights. *See Mack v. American Fletcher Nat'l Bank & Trust Co.,* 510 N.E.2d 725, 741 (Ind.Ct.App. 1987) (observing that unpublished depositions were never part of record considered by trial court in ruling on motion for summary judgment), *trans. denied.* Being evidence "outside the record," we may not consider them either. *See id.*

Moreover, contrary to Qualls' assertion that the "persuasive authority [of the journals] is for [this] Court to determine[,]" we do not reweigh evidence or judge the credibility of witnesses when reviewing a trial court's judgment in a termination proceeding. *See In re M.B. and P.B.,* 666 N.E.2d 73, 76 (Ind.Ct.App. 1996), *trans. denied.* Rather, we consider only the evidence that supports the trial court's judgment together with all reasonable inferences to be drawn therefrom. *Id.*

of Darringer's parental rights is contrary to law.

## FACTS AND PROCEDURAL HISTORY

Qualls is the mother of six children: D.Q., born February 7, 1988; A.Q., born April 24, 1989; S.Q., born September 24, 1991; Ke.Q., born June 6, 1994; Ka.Q., born May 6, 1996; and R.Q., born November 7, 1997. Darringer is the alleged father of A.Q. and his whereabouts are unknown. The identities and whereabouts of the men who fathered Qualls' other children are also unknown.

The OFC first became involved with Qualls and her children on April 14, 1998, when the children were found wandering along Madison Avenue without supervision. The children were dirty and smelled of urine, and the Marion County Sheriff's Department deemed Qualls' residence to be unsanitary. The OFC removed the children from Qualls' custody and placed them in the Marion County Children's Guardian Home. Qualls entered into a Services Referral Agreement with the OFC in which she agreed to cooperate with family preservation and homemaker services. The OFC returned the children to Qualls after a case manager verified that the residence was safe and clean.

On April 24, 1998, a case manager visited Qualls' residence and observed two of the children playing in the street unsupervised. The case manager found Qualls asleep on the floor of her apartment. There were no diapers in the residence and no clean clothes for the children. A therapist from family preservation services learned that Qualls was being evicted due to non-payment of rent and the poor condition of her apartment. The children were again removed from Qualls' custody and placed in the Guardian Home. D.Q. and A.Q. have lived with their maternal aunt

and uncle since April 1998. S.Q., Ke.Q., Ka.Q., and R.Q. have lived together in foster care since August 1998.

On April 29, 1998, the OFC filed a petition alleging D.Q., A.Q., S.Q., Ke.Q., Ka.Q., and R.Q. to be children in need of services ("CHINS"). Qualls admitted to the allegations in the OFC's petition, and the trial court adjudicated the children to be CHINS. Pursuant to the court's dispositional decree, Qualls agreed to participate in home-based and individual counseling, a parenting assessment, parenting classes, and a drug and alcohol assessment. In addition, Qualls was to have regular visitation with the children, maintain a stable source of income, and find suitable housing with adequate bedding and functioning utilities.

Qualls successfully completed the parenting assessment, parenting classes, and the drug and alcohol assessment. She was also actively engaged in individual counseling with the Reverend Ralph Spears from August 15, 1998, and she visited the children regularly over the course of the case. However, she was initially unable to hold a job or find adequate housing for the children. In August 1999, Qualls presented to Wishard Hospital with a long history of insomnia, fatigue, jitteriness, fine tremors, hyperactivity, an increased heart rate, and forgetfulness. She exhibited a protrusion of the eyeballs and an enlarged goiter in her neck; had difficulty eating solid foods, swallowing, and breathing; and had lost over two hundred pounds in seventeen months. Qualls was subsequently diagnosed with Graves' Disease, a hyperthyroid condition, and placed on medication. Thereafter, from the Fall of 1999, Qualls was able to maintain consistent employment.

On March 9, 1999, the OFC filed a petition for the involuntary termination of the parental rights of Qualls and Darringer.

A hearing on the OFC's petition was held on February 17, 2000, at which point Qualls was still gainfully employed but had not yet acquired housing. Darringer did not appear at the termination hearing. After the parties had rested, the trial court took the OFC's petition for termination under advisement.

Qualls subsequently filed a motion requesting that the trial court stay its order regarding termination and allow her to show proof that, since the February 17, 2000 hearing, she had obtained suitable housing, furnishings, and bedding for the children in accordance with the dispositional decree. The trial court granted Qualls' motion over the OFC's objection and conducted a hearing on the housing issue on June 26, 2000. On July 27, 2000, the trial court entered findings of fact and conclusions thereon denying the OFC's petition for termination of parental rights. The OFC and Child Advocates, as the children's guardian ad litem, appeal.

## DISCUSSION AND DECISION

### Issue One: Reopening of Case

The OFC and Child Advocates first contend that the trial court erred when it reopened the case to allow Qualls to present additional evidence after the parties had rested. Evidence must be offered during the course of a trial and it is a matter of discretion whether a trial court will permit a party to present additional evidence or testimony once the party has rested, once both parties have rested, or after the close of all of the evidence. *In re Paternity of Seifert*, 605 N.E.2d 1202, 1207 (Ind.Ct.App.1993), *trans. denied.* A trial court's decision in this regard will be disturbed only if there is a clear abuse of discretion. *In re Marriage of Ford*, 470 N.E.2d 357, 362 (Ind.Ct.App.1984), *trans. denied.*

Here, Qualls presented post-hearing evidence of a lease agreement that she had signed on February 21, 2000, as well as photographs of her new apartment and its furnishings. The record reflects that the OFC and Child Advocates adequately cross-examined Qualls concerning her new living arrangements. The OFC and Child Advocates also offered the testimony of the OFC case manager and the children's guardian ad litem, both of whom reaffirmed their recommendations for termination of Qualls' parental rights despite her recent acquisition of housing. The OFC and Child Advocates have not demonstrated how the trial court's decision to allow Qualls to present post-hearing evidence resulted in any prejudice. *See Stepp v. Duffy*, 654 N.E.2d 767, 775 (Ind.Ct.App.1995), *trans. denied; see also Fuehrer v. Fuehrer*, 651 N.E.2d 1171, 1175 (Ind.Ct.App. 1995) (upholding trial court's decision to reopen dissolution case to permit wife to present evidence of post-trial cancer diagnosis and medical costs and to request larger share of marital pot than previously requested), *trans. denied.* Accordingly, we find no clear abuse of discretion.

### Issue Two: Termination of Qualls' Parental Rights

The OFC and Child Advocates next challenge the trial court's denial of the OFC's petition for termination of Qualls' parental rights. To support a petition to terminate parental rights, the OFC must show, among other things, that termination is in the best interests of the child and that there is a reasonable probability:

(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child[.]

Ind.Code §§ 31–35–2–4(b)(2)(B)(i) and (ii); Ind.Code § 31–35–2–4(b)(2)(C). The OFC's burden of proof in this respect is met by clear and convincing evidence. *J.K.C. v. Fountain County Dep't of Pub. Welfare,* 470 N.E.2d 88, 91 (Ind.Ct.App. 1984).

Here, the trial court made specific findings of fact and conclusions thereon pursuant to Qualls' request in entering its judgment against termination. Accordingly, we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. *In re Ellis,* 681 N.E.2d 1145, 1147 (Ind.Ct.App.1997), *trans. denied.* In so doing, we neither reweigh the evidence nor judge the credibility of the witnesses, and we consider only the evidence that supports the judgment together with all reasonable inferences to be drawn therefrom. *In re M.B. and P.B.,* 666 N.E.2d 73, 76 (Ind.Ct.App.1996), *trans. denied.* The judgment may be set aside only if the findings or judgment are clearly erroneous. *Id.* A finding is clearly erroneous when there are no facts or inferences to be drawn therefrom which support it. *Id.* A judgment is clearly erroneous when it is unsupported by the findings and conclusions entered on those findings. *Ellis,* 681 N.E.2d at 1147.

Moreover, because the OFC and Child Advocates are faced with a ruling against termination at this time, they must overcome the additional burden of appealing from a negative judgment. *See In re J.O.,* 556 N.E.2d 948, 950 (Ind.Ct. App.1990), *trans. denied.* To prevail on an appeal from a negative judgment, the appellant must establish that the judgment is contrary to law. *Drudge v. Brandt,* 698 N.E.2d 1245, 1249 (Ind.Ct.App.1998). A judgment is contrary to law when the evidence is without conflict and all reasonable inferences to be drawn from that evidence lead to but one conclusion, but the trial court has reached a different conclusion. *Id.* Only under such circumstances may this court reverse. *J.O.,* 556 N.E.2d at 950.

The OFC and Child Advocates challenge the trial court's determination that the OFC failed to prove, by clear and convincing evidence, that there exists a reasonable probability the conditions resulting in the children's removal from Qualls' custody will not be remedied or that the continuation of the parent-child relationships poses a threat to the children's well-being. *See* I.C. § 31–35–2–4(b)(2)(B)(i) and (ii). In particular, the trial court found:

> [T]he symptoms associated with [Qualls'] dysfunctional thyroid condition or Grave's [sic] Disease were typical and could have accounted for some of her negligent behaviors and history of irresponsibility, including her careless child-rearing practices. These symptoms included lack of focus and concentration, sleepiness, inattention, goiter, and obesity. Many of the above-listed symptoms had lessened and some had disappeared completely by the time of the February hearing. Many had improved to a greater degree by the June hearing. Delpha had been consistently employed at the Kroger Bakery where she earned $8.40 per hour working 46–50 hours per week. She was working an early shift from 4:00 A.M. to 12:30 P.M. as a cake decorator. She had received a raise in her hourly salary and was planning to be moved to the day shift. She had completed several visits with all of her children. She was unwavering in her desire to be reunited with her children.

Record at 76–77. The court thus concluded that:

> Qualls' diagnosis of a physical illness, namely, Graves['] [D]isease, in August of 1999, leaves questions of fact as to

**910**

whether her prior neglect of these children is clearly representative of what her habitual standards of conduct would be after continuous successful treatment of the condition. The [OFC] did not rebut her testimony concerning her illness or demonstrate why and how reunification could and would result in a threat to the safety and well[-]being of these children.... Therefore, it is not certain, based on clear and convincing evidence, that a reasonable probability that the reasons for removal and the need for continued placement of the children outside of the mother's care are likely to continue. A sufficient record of treatment and prognosis of the mother's medical conditions is needed before a finding of termination of parental rights could realistically be made. Termination of parental rights would be completely inappropriate if the reasons for removal were based on a medical or physical condition that could be remedied by the administration of prescription drugs or other therapies. [Qualls] has already demonstrated that she can benefit from parenting classes and other personal counseling, and from regularly taking her medicine.

Record at 79–80. There is evidence in the record to support the trial court's conclusions.

Qualls' counselor, Reverend Spears, noted in a letter to the OFC case manager on December 7, 1999, that a "major and pivotal change" had occurred due to the "recent discovery of a serious thyroid imbalance which had caused most of the affect that had given her trouble in the past and had led ... to her problem with the children and the [c]ourt." Record at 219. Reverend Spears observed that prior to her diagnosis of Graves' Disease, Qualls was "easily distracted, almost inattentive, [and] sleepy at odd times," but that afterwards, "[n]early her whole affect had changed" and "she now looked like a different person." Record at 219. Reverend Spears testified at the termination hearing that after the diagnosis, there was a "dramatic change in terms of [Qualls'] focus ... [and] attention span" such that she was "suddenly ... able to hold a job and be proud of the job she was doing." Record at 227; 236. He explained that since treatment had been initiated, she had been consistently employed and was hoping to make advancements in her salary and position. Qualls' medical records confirm her history of fatigue, insomnia, and forgetfulness and that the medications being prescribed were alleviating some of those symptoms. In light of this evidence, the trial court made a permissible and reasonable inference that Qualls' medical condition played a role in her previous inability to care for her children.

Further, the evidence reflects that by the February 17, 2000 hearing, Qualls had successfully completed virtually all of the requirements set forth by the dispositional decree and that by the June 26, 2000 hearing, she had obtained suitable housing, furnishings, and bedding for the children. Indeed, Reverend Spears observed in October 1998 that Qualls "has rather cheerfully attempted to comply with the [c]ourt's wishes." Record at 217. He stated that she "has shown me her certificate of completion of parenting skills class and has quoted many of the precepts of child care now newly learned. Observing her with four of the six children, [Qualls] shows genuine motherly concern and even a joy, with them." Record at 217. In addition, the OFC's parenting assessment reports that Qualls' scores "do not indicate that she intentionally poses a threat to the safety of her children" and that she is "genuinely interested in [their] care and welfare[.]" Record at 291–92. The parenting assessment describes the interac-

tion between Qualls and her children as "naturally affectionate[,]" noting that "they touched and hugged and whispered to each other, and talked back and forth using direct eye contact and expressive body language." Record at 283. The assessment recognizes that "strong bonds ... exist among the [children] and their mother." Record at 283.

In sum, while there was evidence that Qualls had been neglectful of her children in the past, there was also evidence that Qualls had completed her parenting classes, participated actively in individual counseling, maintained steady employment, acquired adequate housing, and made significant improvements since her diagnosis of Graves' Disease in a genuine effort to be reunited with her children. See J.O., 556 N.E.2d at 951 (concluding that, while there was evidence that parent's visitation had been sporadic and somewhat unsuccessful, there was also evidence that parent had held job and hoped to take parenting classes; OFC thus failed to meet its burden in appealing from negative judgment against termination). We cannot conclude that the trial court's determination that the OFC failed to prove, by clear and convincing evidence, that there exists a reasonable probability the conditions resulting in the children's removal will not be remedied or that continuation of the parent-child relationships poses a threat to their well-being is contrary to law.[2] Accordingly, we must affirm the trial court's judgment denying the termination of Qualls' parental rights.

## Issue Three: Termination of Darringer's Parental Rights

The OFC likewise challenges the trial court's denial of its petition for termination of Darringer's parental rights with respect to A.Q. It is undisputed that Darringer's whereabouts have been and continue to be unknown, that he never made an appearance in the CHINS or termination proceedings,[3] that he never contacted the OFC in response to A.Q.'s adjudication as a CHINS, and that his paternity has never been established.[4] Nevertheless, the trial court's findings and conclusions thereon are inadequate for us to determine whether the trial court intended to deny the OFC's petition for termination of Darringer's parental rights.

The trial court found only that Darringer's whereabouts remained unknown throughout the CHINS proceeding and that A.Q. had been removed from Darringer's custody for more than six months pursuant to the terms of the dispositional decree. See Ind.Code § 31–35–2–4(b)(2)(A)(i). However, the trial court failed to make any other determinations under Indiana Code Section 31–35–2–4 with respect to Darringer, and specifically, whether there existed a reasonable probability that the conditions resulting in A.Q.'s removal from Darringer's custody would be remedied and whether termination of

---

2. Having held that the OFC failed to meet its burden in this respect, we need not address the OFC's and Child Advocates' claim that termination of Qualls' parental rights is in the best interests of the children and that the trial court's conclusion otherwise is contrary to law. To support a petition for termination of parental rights, the OFC bears the burden of proving each element under Indiana Code Section 31–35–2–4(b) by clear and convincing evidence. See J.K.C., 470 N.E.2d at 91.

3. The OFC demonstrated proof that summons in the termination proceeding had been served upon Darringer by publication. See Ind. Trial Rule 4.13.

4. We note that the statutes governing the termination of parental rights do not require an adjudication of paternity prior to termination. See In re A.C.B., 598 N.E.2d 570, 572 (Ind.Ct. App.1992).

Darringer's parental rights was in A.Q.'s best interests. *See* I.C. §§ 31–35–2–4(b)(2)(B)(i) and (C). Indeed, the trial court's judgment is denominated an "Order Regarding the Termination of the Parent Child Relationship *of Mother Delpha Qualls*" and makes no reference to Darringer. Record at 72 (emphasis added). We therefore remand to the trial court for an adequate assessment of whether the facts are sufficient to support a termination of Darringer's parental rights with respect to A.Q.

Affirmed in part and remanded for further proceedings.

KIRSCH and VAIDIK, JJ., concur.