Jane CARRERA, Appellant,

v.

**ALLEN COUNTY OFFICE OF FAMILY AND CHILDREN,**
Appellee.

No. 02A03–0105–JV–135.

Court of Appeals of Indiana.

Nov. 26, 2001.

## OPINION

MATHIAS, Judge.

Jane Carrera ("Mother") appeals the trial court's order terminating her parental rights to her nine-year old son N.C. Mother argues that there is insufficient evidence to support the trial court's finding that termination was in N.C.'s best interest.

We affirm.

### Facts and Procedural History

The facts most favorable to the judgment reveal that on February 7, 1999, the shelter where Mother and N.C. (then eight years old) were residing evicted them for non-compliance and for failing to utilize referrals for more permanent housing. Upon eviction, Mother was stopped by Fort Wayne Police for having expired plates on her vehicle, and was taken to the MIT facility at Park Center[1] because of her uncooperative behavior. Upon Mother's authorization, the Allen County Office of Family and Children ("OFC") arranged for N.C. to be placed in protective custody. OFC recommended that N.C. be removed from Mother's custody because Mother was unable to provide N.C. with necessary and appropriate housing or to maintain steady employment, had no plan to obtain housing or employment, and showed no interest in accepting any of the services provided by OFC to assist her in these endeavors. The trial court agreed with OFC's recommendation, and on February 17, 1999, N.C. was made a temporary ward of the Division of Family and Children ("DFC") while OFC and SCAN[2] attempt-

Richard L. Williams, Fort Wayne, Indiana, Attorney for Appellant.

April S. Grunden, Van Gilder & Trzynka, Fort Wayne, Indiana, Attorneys for Appellee.

1. Park Center is a private, nonprofit counseling and psychiatric center, offering a full continuum of behavioral healthcare including: outpatient, residential, addiction, home-based, and managed care services. The MIT (Mobile Intervention Team) facility at Park Center is a 24–hour, seven-day-a-week crisis intervention service, which is designed specifically to prevent hospitalizations. The MIT facility makes interventions at the request of law enforcement, family members, primary care providers, hospitals, and businesses. *See* http://www.parkcenter.org.

2. SCAN, Inc. is a not-for-profit organization, founded in 1974, to *S*top *C*hild *A*buse and *N*eglect through direct service, education,

ed to assist Mother in finding appropriate housing and adequate employment.

Six months later in August 1999, without assistance, Mother moved into an apartment and obtained employment as a janitor at a local church. N.C. was returned to Mother under an informal adjustment, and SCAN employees began home-based visits with Mother. SCAN home visits ceased in October of 1999 when Mother was evicted from her apartment. After being evicted from their apartment, Mother and N.C. began living in a motel, and Pastor Larry Maddox ("Maddox"), mother's employer, testified that shortly after Mother's eviction, Mother and N.C. lived in Mother's vehicle and occasionally slept at the church where Mother worked. Maddox informed Child Protective Services about Mother's housing situation, and on October 26, 1999, N.C. was once again removed from Mother's custody, and placed with DFC. After N.C.'s return to DFC, Mother visited with N.C. at the SCAN location, but she was evasive when asked where she was residing, and was uncooperative in accepting assistance in obtaining employment.

Mother's dispositional hearing was held on January 31, 2000. At the hearing, the trial court issued its Parent Participation Plan, detailing the steps Mother had to take in order to become reunited with N.C., including: maintain clean, safe, and appropriate housing at all times; cooperate with all caseworkers; and successfully complete and benefit from vocational assessment for job training and job placement. State's Exhibit No. 11. Mother was clearly informed of these required steps, and that her compliance with them would result in N.C.'s return.

However, Mother continued to refuse assistance, and remained non-compliant.

coordination and advocacy. *See* http://

When she failed to obtain another permanent residence, refused to accept SCAN services for housing and employment, and failed to find employment on her own, OFC instituted termination proceedings. On March 7, 2001, the trial court held a termination hearing and heard evidence regarding Mother's non-compliance with its Parent Participation Plan. On April 9, 2001, the trial court terminated the parent-child relationship between Mother and N.C., concluding, among other things, that termination was in the best interest of the child. Mother appeals.

### Discussion and Decision

 This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. Parental rights are of a constitutional dimension, but the law provides for the termination of those rights when parents are unable or unwilling to meet their parental responsibilities. *In re K.S.*, 750 N.E.2d 832, 836 (Ind.Ct.App.2001) (citing *In re L.S.*, 717 N.E.2d 204, 208 (Ind.Ct. App.1999) *trans. denied*). Although a parent has a right to establish a home and raise her children, these rights are not absolute and must be subordinated to the child's interests when the child's emotional and physical development is threatened. *In re T.F.*, 743 N.E.2d 766, 773 (Ind.Ct. App.2001) *trans. denied.* The trial court need not wait until the child is irreversibly harmed such that his physical, mental and social development is permanently impaired before terminating the parent-child relationship. *Id.*

To effect the involuntary termination of a parent-child relationship, OFC must establish:

(A) one (1) of the following exists:

 (i) the child has been removed from the parent for at least six (6)

www.scanfw.org.

months under a dispositional decree;

 (ii) a court has entered a finding under IC 31–34–21–5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made;

 (iii) after July 1, 1999, the child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months;

 (B) there is a reasonable probability that:

 (i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

 (ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

 (C) termination is in the best interest of the child; and

 (D) there is a satisfactory plan for the care and treatment of the child.

Ind.Code § 31–35–2–4(b)(2) (1998). OFC must establish these elements by clear and convincing evidence. Ind.Code § 31–34–12–2 (1998). Mother contends that OFC failed to meet its burden and presented insufficient evidence to support the termination of her parental rights. Specifically, she argues that OFC failed to prove by clear and convincing evidence that termination was in the best interest of N.C.

 In deference to the trial court's unique position to assess the evidence, in reviewing termination proceedings on appeal, this court will not reweigh the evidence nor assess the credibility of the witnesses. *In re L.S.*, 717 N.E.2d at 208. We consider only the evidence that supports the trial court's decision and the reasonable inferences drawn from that evidence, and will set aside the judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *Id.*

 In determining whether termination of the parent-child relationship was in N.C.'s best interest, the trial court was required to look at the totality of the evidence. *J.K.C. v. Fountain County Dep't. of Pub. Welfare*, 470 N.E.2d 88, 93 (Ind.Ct. App.1984). Children are not removed from the custody of their parents just because there is a better place for them, but because the situation while in the custody of their parents is "wholly inadequate for their survival." *Id.* (citing *In re Miedl*, 425 N.E.2d 137, 141 (Ind.1981)). We have previously stated that a "parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that the continuation of the parent-child relationship is contrary to the child's best interests." *In re B.D.J.*, 728 N.E.2d 195, 203 (Ind.Ct.App.2000) (quoting *In re D.V.H.*, 604 N.E.2d 634, 638 (Ind.Ct. App.1992)); *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind.Ct.App.1997).

 The totality of the evidence in this case demonstrates a clear showing that termination of the parent-child relationship between Mother and N.C. was proper. Prior to N.C.'s removal, he and Mother did not have a permanent residence and lived in a motel, an automobile, a church, and a shelter. Upon eviction from the shelter, and with no plan for permanent residence, OFC removed N.C. from Mother's care. After making services available to Mother, and clearly explaining to Mother the lifestyle changes and increased responsibility

she needed to assume, one year later the court found that "mother has led a transient existence, without stable housing for herself and the child," and terminated the parent-child relationship. Appellant's App. p. 10. Given Mother's chronic history, we cannot conclude this holding was clearly erroneous.

Moreover, since N.C.'s removal, Mother has demonstrated nothing but hostility toward the support system established to foster reunification, and has refused every service and assistance program offered to her. Rex McFarren, CASA Director, testified that Mother was informed that her compliance with program directives was necessary for N.C.'s return, yet she continued to refuse assistance. R. at 157–58. Kimberly White, OFC caseworker, testified that Mother refused assistance because of her "dignity" and that she simply "did not want help from the system." R. at 149. Similar testimony was elicited from Tonya Miller, OFC caseworker, and SCAN employee, Karen Emery.[3] This testimony reveals Mother's persistent unwillingness and inability to provide N.C. with adequate housing and stability, and to ultimately provide for his well-being. Our common law sanctions termination of parental rights when parents are *unwilling* to meet their responsibilities as parents. *In re B.D.J.*, 728 N.E.2d at 200.

A parent's habitual patterns of conduct are a telltale indicator of future detrimental behavior and conditions. *In re T.F.*, 743 N.E.2d at 774. Here, Mother has consistently refused the services and assistance plans repeatedly offered to her for more than one year in an attempt to reunite her with her son. Even after N.C.

was returned to Mother under the informal adjustment, Mother returned to a life style that could not adequately provide for N.C.'s basic needs. After losing her housing and employment, Mother chose to continue to refuse assistance and services, and demonstrated an unwillingness and inability to provide for N.C.'s basic needs on her own. After N.C. was removed a second time, Mother again chose to refuse assistance and services despite the knowledge that acceptance and cooperation would result in N.C.'s return. Such refusal, while perhaps personally satisfying to Mother, clearly demonstrates her chronic unwillingness and inability to provide for N.C.'s basic needs, supporting the trial court's determination that termination of Mother's parental rights is in the best interest of N.C.

### Conclusion

In light of the evidence adduced at the termination hearing and Mother's unwillingness to provide for N.C.'s most basic needs, we cannot conclude that the trial court's decision to terminate Mother's parental rights was clearly erroneous.

Affirmed.

DARDEN, J., and VAIDIK, J., concur.

---

**3.** Ms. Miller testified that Mother was very uncooperative, and that she "flat out refused to take advantage of the services being offered to her." R. at 90–91. Ms. Emery testified that she discussed the importance of finding housing and employment with Mother, and that Mother said that it "was her business to take care of." R. at 75. Ms. Emery further testified that Mother refused services and did "not accept any help." R. at 76.