Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 30 2013, 7:41 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JILL M. ACKLIN**
Acklin Law Officer, LLC
Westfield, Indiana

ATTORNEYS FOR APPELLEE:

**CAREY HALEY WONG**
Child Advocates, Inc.
Indianapolis, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**PATRICK M. RHODES**
DCS, Marion County Local Office
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF PARENT-CHILD RELATIONSHIP OF M.G. & A.G. (Minor Children), | ) ) ) ) | |
| and | ) ) | |
| S.S. (Mother) & S.G. (Father), | ) ) | |
| Appellants, | ) ) | No. 49A05-1211-JT-583 |
| vs. | ) ) | |
| CHILD ADVOCATES INC. Appellee | ) ) ) | |
| AND | ) ) | |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee. | ) ) | |

**July 30, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

S.S. ("Mother") and S.G. ("Father") appeal the involuntary termination of their parental rights ("TPR") as to two of their children, M.G. and A.G., in Marion Superior Court's Juvenile Division. Specifically, Mother and Father argue that the trial court abused its discretion in admitting and relying upon exhibits 1-18, offered by the guardian ad litem, Child Advocates, Inc. ("GAL"). We disagree and affirm.

## I. Facts and Procedural History

A. *Children's Background and Statement of Underlying Case*

M.G. and A.G. are two of three children born to both Mother and Father. M.G. and A.G. also have three living older siblings, who were born to Mother while she was in relationships with other men ("Sibling 1", "Sibling 2", "Sibling 3"). They also have two afterborn siblings, one of whom is the child of Mother and Father ("Sibling 6"), and the other of whom is a child of Mother and another man ("Sibling 7").

M.G. and A.G. were removed from the care of their parents as very young children, and have spent the majority of their lives in foster care. Both have been placed in the same pre-adoptive therapeutic foster care home since April 19, 2010. Based on their

ongoing permanency plan of adoption, their GAL filed a petition to terminate Mother's and Father's parental rights ("TPR"), in order to move towards permanent placement for M.G. and A.G. with their foster parent.

B. *Mother's Background and Criminal History*

In all, Mother has given birth to eight children, at least seven of whom[1] have been determined to be Children in Need of Services ("CHINS"). One of the children ("Mother's Deceased Child") died in a house fire allegedly set by Sibling 1 under conditions of neglect. At this time, at least six of the children are in foster care, and only Sibling 6 has regular visitation with Mother.

Mother first became involved with the Indiana Department of Child Services ("DCS") in 1999. In the thirteen years since that initial intervention, Mother's children have been removed from her care and adjudged CHINS six separate times. Despite these numerous interventions and a total of seventy-eight referrals for services since July 2010 until the trial, Mother continuously failed to maintain sobriety, gain steady employment,[2] or obtain suitable housing for her and the children. Further, her criminal history and psychological conditions raise additional concerns.

At the time of trial, Mother had maintained her sobriety for nearly seven months; but that is the longest period of time she has ever been sober. The record reflects that her life has been a series of recoveries, followed by relapses. In addition, Mother never

---

[1] Because Sibling 7 was born after the trial court issued its judgment in this case, the status of that child is unknown.

[2] Mother did clarify at trial that she worked through temporary employment agencies for a number of years, but she rarely worked for more than a few months at a time.

achieved sobriety for any appreciable time at any other point in her children's lives, and certainly failed to do so at all until Sibling 6 was born and removed from her care. In fact, she continued to use cocaine through 2011 and throughout her pregnancy with Sibling 6.

With respect to housing, Mother resided at Dove House, a women's recovery home, where she was under near-constant supervision when this TPR action went to trial. The recovery home allowed for visitation arrangements for Mother and Sibling 6, but it typically does not allow children to reside there. Thus, even if she were to reunite with the children, she would need to find suitable housing. Mother still has no suitable housing for the children, and little income aside from her Social Security Supplemental Income ("SSI"),[3] which is less than $700 per month.

Mother's criminal history includes two felony battery charges against her own children. Her first charge resulted in a misdemeanor conviction for a lesser-included offense. However, as a result of the second charge, she was convicted of the applicable felony and sentenced to a week in jail. She has also been convicted of operating a vehicle having never received a license, a misdemeanor.

In addition to her drug use, financial instability and criminal history concerns, Mother also faces a variety of mental and psychological issues that hinder her parenting ability. One therapist noted that Mother "has perpetrated severe abuse against her intimate partners and may be at risk of perpetrating physical abuse that *may be lethal* in nature." Ex. Vol. II, GAL Ex. 56 (emphasis added). Mother is diagnosed with

---

[3] Mother has been determined to be disabled as a result of depression. She is allowed to work up to twenty hours per week while still receiving her SSI payments.

depression and cocaine dependence. She does not appear to understand the trauma her behavior has caused to her children.

Finally, Mother's participation in services to reunify with her children has been inconsistent at best, and at times nonexistent. Although in the few months leading up to the TPR trial she increased her participation in services, much of her focus seemed to be not on M.G. and A.G's recovery and reunification, but rather only her reunification with Sibling 6. Additionally, the court held Mother in contempt for her failure to comply with drug screens and terminated her visitation rights multiple times after inappropriate behavior during visitations.[4]

C. *Father's Criminal History*

Father is currently incarcerated and has been since 2011. He has not seen M.G., A.G., or Sibling 6 since he was incarcerated. He is currently serving a sixteen-year sentence for Class B felony robbery, and his earliest possible release date is 2018. Father has also been adjudged an habitual offender, with a record of eleven criminal convictions since 2002. His first arrest was in 1991, and his first conviction was in 1996. His most recent crimes include theft, resisting law enforcement, possession of paraphernalia, robbery, and battery. During the course of the 2009 CHINS petition that led to the current TPR, Father was incarcerated three separate times. Father never participated in services ordered by the juvenile court.

---

[4] Such behavior included: arriving late, leaving early, cancelling at the last minute, failing to arrive without prior notification, inappropriate discussions, threatening staff, threatening foster parents, and threatening to "donkey kong" her children. Her children describe being "donkey konged" as Mother, who is six feet, three inches tall and weighs two hundred and eighty pounds, bringing her closed fist down onto their heads in a forceful manner.

D. *Extended DCS and Procedural History*

Mother's first DCS intervention was in 1999, when Sibling 2, then a newborn, tested positive for marijuana. Although Sibling 1 was in good health, Mother entered into an Informal Adjustment ("IA") with respect to Sibling 1 and Sibling 2, in which Mother agreed to services including: completion of a parenting assessment; a drug and alcohol abuse evaluation; meeting the medical needs of the children; maintenance of a clean and safe house with adequate bedding, functional utilities, adequate supplies of food and food preparation facilities; and notification of the family case manager regarding any change in address, phone number, employment, or household composition. Ex. Vol. I, GAL Ex. 1.

On February 19, 2002, three years following the IA, DCS investigated and substantiated claims of neglect of Sibling 1, Sibling 2, and Mother's Deceased Child, based on findings that Mother exposed the children to an environment that endangered the life and/or health of the children, that Mother failed to adequately supervise the children, and that Mother's Deceased Child died due to her neglect.[5] Ex. Vol. II, GAL Ex. 50(A).

On March 10, 2002, DCS substantiated the allegations of abuse based on bruises, cuts and welts observed on Sibling 1 at school. Ex. Vol. II, GAL Ex. 50(A). DCS also substantiated allegations of neglect of Siblings 2 and 3. DCS filed a CHINS petition on March 12, 2003, alleging that Sibling 1, Sibling 2 and Sibling 3 were CHINS, and on the

---

[5] The full details of this incident were redacted from GAL Exhibits 3, 50 and 50(A). Limited as we are to the evidence supporting the judgment of the trial court, we decline to include details that were redacted from the evidence in our review.

6

same day, the juvenile court ordered the children to be cared for as wards of DCS,[6] returning Sibling 1 to Guardians' Home, where he had been in residential care, and removing Siblings 2 and 3 to foster care. Additionally, the court established a permanency plan of reunification and granted authorization for supervised visitation by Mother. Ex. Vol. I, GAL Ex. 4.

On April 24, 2003, the juvenile court ordered Mother to participate in services including: obtaining suitable housing, home-based counseling, parenting assessment, psychological evaluation, drug and alcohol assessment, random drug testing, substance abuse treatment, prohibition of the use of drugs, and consistent visitation. Ex. Vol. I, GAL Ex. 5. Mother eventually completed the required services, and the children were returned to Mother's care.

Less than two years later, on February 9, 2005, DCS filed a second CHINS petition, this time alleging that M.G., who was born on March 1, 2004, together with Sibling 1, Sibling 2, and Sibling 3 were CHINS and that Mother and Father[7] failed to provide the children with an environment free of domestic violence and abuse. Ex. Vol. I, GAL Ex. 6. The petition was filed after Sibling 1 obtained a firearm from the home and brought it to school. The DCS investigator, while observing the children in the home, found bruising on Sibling 2's legs, arms and lower back, and cigarette burns on Sibling

---

[6] At the time, child welfare agencies were conducted through a county-based system. The Marion County Office of Family and Children was initially responsible for the children in this case. The office has since become the Marion County DCS, and is an arm of the State's DCS entity. Throughout, for consistency's sake, we will refer to the offices of state agencies concerned with the welfare of M.G. and A.G. as DCS.

[7] At this time, Mother and Father had been married and were living together with all of Mother's children, including M.G. The two were married from 2005 until their divorce in 2009.

3's arms, groin, stomach and thighs. Further, the DCS investigation revealed that Father physically abused Mother in the presence of the children. Based on these observations, DCS determined that all of the children were endangered by abuse in the home. After an initial hearing, the court again made the children wards of DCS, and Sibling 1 was placed in the Juvenile Detention Center, while M.G. and the other two children were placed in emergency shelter care.

The juvenile court issued a Participation Decree on April 21, 2005, ordering Mother and Sibling 1's father [8] to participate in services including: home-based counseling, establishment of a protection plan, parenting assessment, parenting classes, drug and alcohol assessment, random drug testing, substance abuse treatment, establishing paternity of the children, and consistent visitation. Ex. Vol. I, GAL Ex. 8. On December 13, 2005, the juvenile court conducted a Placement and Jurisdiction review in the case, and closed the 2005 CHINS, reunifying M.G. and her siblings with Mother. Ex. Vol. I p. 38, GAL Ex. 9.

Just over five months after the family was reunified, DCS filed a third CHINS petition. This petition alleged that M.G., Sibling 1, Sibling 2, and Sibling 3 were CHINS because Mother physically abused Sibling 2. The family case manager filing the petition observed scratches on Sibling 2's eyes and facial bruising. At the initial hearing, the children were again made wards of DCS, with Sibling 1 placed in Guardians' Home, and M.G., Sibling 2, and Sibling 3 in foster care. Ex. Vol. I, GAL Ex. 11. The juvenile court again issued a participation decree, ordering Mother to complete services including:

[8] Sibling 1's father is not a party to the current proceedings.

home-based counseling, protection plan, parenting assessment, school attendance, parenting classes, drug and alcohol assessment, substance abuse treatment, prohibiting the use of drugs, participation in a domestic violence program and consistent visitation. Ex. Vol. I, GAL Ex. 12.

Before the 2006 CHINS petition was closed, on November 3, 2006, Mother gave birth to A.G. At birth, A.G. tested positive for cocaine, and DCS filed a petition alleging that A.G. was a CHINS. Ex. Vol. I, GAL Ex. 14. On November 22, 2006, A.G.'s whereabouts were unknown, and the juvenile court ordered her removal from Mother's care because of the pending CHINS case. A court-ordered, psychiatric evaluation found Mother to be unable to care for her children. Ex. Vol. I, GAL Ex. 13.

On December 21, 2006, the court held an initial hearing regarding a TPR petition that sought to terminate Mother's and Father's relationships with M.G., Sibling 1, Sibling 2, and Sibling 3. Ex. Vol. I, GAL Ex. 15. However, before the TPR process was completed, DCS filed a motion to dismiss its TPR petition, and that motion was granted on January 9, 2008. Ex. Vol. I, GAL Ex. 16.

Roughly ten months later, on October 21, 2008, DCS filed a request for detention and temporary custody of M.G. and A.G., as well as Sibling 1, Sibling 2, and Sibling 3. Ex. Vol. I, GAL Ex. 17. In the request, DCS alleged that Mother had physically abused Sibling 1 after Sibling 1 had been disciplined at school for fighting. At the detention hearing, the juvenile court removed Sibling 1 from Mother's care, and, on DCS's request, allowed M.G., A.G., Sibling 2 and Sibling 3 to remain with Mother.

One year later, on October 28, 2009, DCS filed a fifth CHINS petition, which eventually led to this appeal. This time DCS alleged that Mother failed to provide the children with a "safe, stable, and appropriate living environment free from domestic violence." Ex. Vol. I, GAL Ex. 19. At the time, Mother faced criminal charges related to an altercation she had with Father when he came to visit M.G. and A.G. According to the police report and probable cause affidavit from the incident, Mother hit Father in the back of the head with a closed fist while he was greeting the children.[9] Thereafter, Mother's then-boyfriend apparently led Father out of the home and also hit him.

An initial hearing regarding the 2009 CHINS petition was held on October 29, 2009. Both Father and Mother appeared. The court noted in its findings that Mother failed to comply with four drug screens, and that she was unable to provide the children with a home environment free from domestic violence. As a result of the hearing, Sibling 1, Sibling 2, Sibling 3, M.G. and A.G. were all removed from Mother's home, and both Mother and Father received authorization for parenting time with respect to M.G. and A.G.[10] All of the children were once again made wards of DCS, and the court authorized DCS to place some of the children in foster care and some in therapeutic foster care.

A pre-trial hearing related to the 2009 CHINS petition was held on December 17, 2009. Both Father and Mother appeared, and the court increased Father's parenting time, while the court admonished Mother to complete previously court-ordered services including: caseworker visits, maintain a legal and stable source of income, obtain suitable

---

[9] Both Father and Mother now deny the incident, saying that Father crafted the story in attempt to remove his children from Mother's care.

[10] Mother also received authorization for parenting time with respect to Sibling 1, Sibling 2, and Sibling 3.

housing, home-based counseling, parenting assessment, psychological evaluation, random drug testing, domestic violence program, and participation in an outpatient drug treatment program. The children remained wards of the DCS, continued placement in foster care, and the court proceeded to disposition in the case, adopting DCS's pre-disposition report.

A fact-finding hearing commenced on February 18, 2010. There, the court held that it would be "contrary to the health and welfare of the children to be returned home," and continued the children's placement in therapeutic foster care, while maintaining a permanency plan for reunification. Ex. Vol. I, GAL Ex. 23.

Two months later, DCS filed a motion for authorization to suspend visits after Mother failed to comply with the rules of the visits. From February 18, 2010 to April 9, 2010, Mother had thirteen supervised visitations scheduled. She arrived on time for only four of the sessions, left early three times, cancelled on the day of the session twice, and failed to notify the agency of a cancellation twice. Additionally, after Mother threatened a foster parent, the agency cancelled the final, scheduled visit for safety reasons. Mother also engaged in inappropriate behavior during visits, including outbursts, negative language, and making threats against service providers and parents. The court granted DCS's petition on April 28, 2010 and suspended Mother's visitation rights with respect to Sibling 1, Sibling 2, Sibling 3, M.G. and A.G.

Meanwhile, all of the children were placed in therapeutic foster care. M.G. and A.G. were placed together, while the other three children were placed in different homes. Although the permanency plan remained reunification, Mother admitted at a disposition

11

hearing on May 6, 2010 that she did not have the ability to appropriately parent the children without the assistance of DCS because of her issues with past domestic violence and drug use. She agreed that she could benefit from DCS services.

After a hearing on June 10, 2010, a TPR was filed against Mother and Father regarding Sibling 1, Sibling 2, Sibling 3, M.G. and A.G., as well as against the alleged fathers of the other children. The petition notes that the children were removed from the care of the parents for at least fifteen of the prior twenty-two months. At a hearing regarding the TPR, the court ordered Mother to complete a drug screen, and continued wardship and placement of the children in therapeutic foster care.

Mother refused to complete the drug screen and DCS filed a petition for rule to show cause to hold Mother in contempt of court on December 13, 2010. The court ruled on the petition on January 27, 2011, and Mother admitted her failure to submit to the screen. The court granted DCS's petition and took punishment under advisement, pending a new drug screen of Mother. Meanwhile, the children remained wards of DCS with continued placement in therapeutic foster care.

On March 10, 2011, the court held a permanency hearing related to the 2009 CHINS petition. The court determined that Mother had participated in services, and DCS requested that the permanency plan remain reunification with parents. However, because Mother had recently tested positive for cocaine and Father was incarcerated, the children remained wards of DCS and continued their placements.

One and one-half years after the 2009 CHINS petition was filed, on April 25, 2011, DCS officials filed a progress report with the court regarding M.G., A.G. and their siblings. In that report, DCS noted the following:

[M.G.] is a young child who looks up to [Sibling 2]. [M.G.] has learned appropreite [sic] boundaries, good touch/bad touch and, respect for others. Sometimes she struggles with following directions in class and staying focused. She earns good grades when she is completes [sic] her daily class work. . . .

[A.G.] is a young child who appears to be on target developmentally. She is currently in a foster care home with her sister [M.G.]. Her older siblings are placed separately. . . .

[M.G.] was diagnosed with reactive attachment disorder. She takes Adderall 2.5 mg daily. She attends play therapy sessions at Midtown with [a licensed therapist] on a weekly basis. [M.G.] has issues with bulling [sic] other children, being disrespectful at times and adjusting to changes in her family dynamics as well. She continues to work on boundaries and positive interactions with siblings and other adult figures. She currently has no physical or dental concerns. . . .

[A.G.] has no identifying marks noted by this [family case manager]. She was diagnosed with Adjustment Disorder with depressed mood. She often exhibits a lot of outburst, cursing and hitting when attempting to adjust to changes in her environment. She also [sic] participating in play therapy with [a licensed therapist] at Midtown. . . .

All of the children have weekly family counseling through their homebased [sic] counselor at Adult and Child. They address issues related to positive communication among siblings and mother, positive interactions, processing changing regarding placement and adoptions, as well as, building trust, decreasing fears, improving boundaries, respect and appropriate parent/child expectations. . . .

[M.G.] is also currently being seen at Midtown to address boundaries, respect, limitations, and inappropriate touching and acting-out. She is also working on decreasing lying and having temper tantrums at home and school. She has had an increase in her medications from 2.5 mg of Adderall a day to adjust decrease [sic] her mood and decrease aggression. . . .

13

[A.G.] and [M.G.] continue to have sessions of play therapy at Midtown . . . to address issues of aggression.

Ex. Vol. I, GAL Ex. 35. The report also noted that M.G. and A.G. had been in therapeutic foster care since December 12, 2009.

Although the progress report initially recommended a permanency plan of reunification, on the date of the placement and jurisdiction review hearing on April 28, 2011, Sibling 1, Sibling 2, Sibling 3, M.G. and A.G. were all placed in pre-adoptive therapeutic foster care homes. Further, Mother failed to maintain clean drug screens and lacked stable housing and employment at the time of the hearing. Father and other alleged fathers of the children no longer participated in services or visited the children. Therefore, the court ordered a new permanency plan of adoption for all of the children. On April 29, 2011, a third TPR was filed regarding Sibling 1, Sibling 2, Sibling 3, M.G. and A.G. against Mother, Father, and other alleged fathers of the siblings.

On October 7, 2011, Mother gave birth to her eighth child, M.G.'s and A.G.'s Sibling 6. Sibling 6 tested positive for cocaine at birth and was removed from Mother's care. He was placed in therapeutic foster care with Sibling 1 and Sibling 2. Thereafter, DCS filed a sixth CHINS petition on October 12, 2011, alleging Sibling 6 was a CHINS. Mother also tested positive for cocaine after giving birth and admitted to cocaine use during her pregnancy. Father, who also fathered Sibling 6, was incarcerated, and Mother needed DCS assistance in order to complete drug treatment services. Both parents admitted the CHINS on January 9, 2012. The court put a permanency plan of reunification in place for Sibling 6.

14

DCS filed a progress report in the case on October 20, 2011, which noted:

[A.G.] is currently in a foster care home with her sister [M.G.]. Due to her daily tantrums at school, [A.G.] was recently placed on Intunvi 2.5 mg and Adderall 5 mg for ADHD. . . .

[M.G.] is also currently being seen at Mid-Town [sic] to address boundaries, respect, limitations, inappropriate touching and acting-out. She is also working on decreasing lying and having temper tantrums at home and school. . . . Over the past several months her behavior has shown some positive changes. She has had reports of appropriate behaviors since the last report.

[A.G.] and [M.G.] continue to have sessions of play therapy . . . to address issues of aggression. [A.G.] has had some periods of aggressiveness related to visitation with both mother and grandmother. At times her aggressive behaviors have increased when visitations by her mother are cancelled. . . .

[Mother] has participated very little with DCS since her last court hearing. No reports have been received from providers that indicate that she may have participated in services.

Ex. Vol. I, GAL Ex. 38. DCS requested in the progress report that Mother's visitations with Sibling 1, Sibling 2, Sibling 3, M.G. and A.G. be suspended immediately as a result of Mother's lack of cooperation and the children's negative behaviors when Mother failed to come to visits, arrived late, left early, and behaved inappropriately.

At the follow-up placement and jurisdiction hearing on October 27, 2011, DCS noted Mother's inconsistent visitation pattern, and the Court-Appointed Special Advocate ("CASA") for the children noted that the children needed to work on their current placement relationships before starting the adoption process. The children remained in

their foster care placements.[11] Also, DCS requested that Mother's visitation rights be suspended again, and that request was granted. Mother has not had visitation with M.G. and A.G. since that ruling.

On June 1, 2012, DCS filed a motion to dismiss its previous TPR regarding Sibling 1, Sibling 2, Sibling 3, M.G. and A.G. Sibling 1, Sibling 2, and Sibling 3 had since been moved out of pre-adoptive placements to temporary placements, while M.G. and A.G. remained with their therapeutic foster care caretaker, who is willing to adopt. Therefore, the GAL agreed with the dismissal for Sibling 1, Sibling 2, and Sibling 3, but objected to the dismissal of the TPR for M.G. and A.G. The court granted DCS's motion to dismiss the TPR as to all of the children on June 4, 2012.

E. *Current Case*

The GAL filed a new TPR against Mother and Father regarding M.G. and A.G. on June 11, 2012.[12] DCS was later joined as a party to the action. The court held an initial hearing on June 14, 2012, at which Mother appeared but Father did not, as he was incarcerated and had not yet been properly summoned. At the initial hearing, Mother entered a denial through her appointed counsel. At a pre-trial hearing on August 9, 2012,

---

[11] At this point, Sibling 1 had been removed from therapeutic foster care and placed in a group home, while the other children remained in various therapeutic foster care placements. M.G. and A.G. remained together in the same pre-adoptive therapeutic foster care home.

[12] Although DCS typically files TPR petitions, this particular case was filed by M.G. and A.G.'s GAL pursuant to the GAL's authority under Indiana Code section 31-35-2-4(a), which states in pertinent part: "A petition to terminate the parent-child relationship involving a delinquent child or a child in need of services may be signed and filed with the juvenile or probate court by any of the following: (1) the attorney for [DCS]. (2) The child's court appointed special advocate. (3) The child's guardian ad litem."

16

after Father was properly summoned, Father also entered a denial through his appointed counsel.

Trial commenced on August 27, 2012, and the trial court terminated Mother's and Father's respective parental rights on October 22, 2012.

E. *Current Condition of the Children*

Both M.G.'s and A.G.'s behavior has improved significantly while in their pre-adoptive home. Their foster parent, T.W., is a c ertified therapeutic foster care provider who has worked diligently to accommodate the needs of the children. She has a set of infant twins of her own, works at a day care while M.G. and A.G. are at school, and does wedding and portrait photography some evenings and weekends. Although T.W. is a single parent, her mother, who is also a certified therapeutic foster care provider, lives in the same neighborhood and helps to care for all of the children. T.W. also took substantial time off work to help prepare A.G. for school and ensure that any learning disabilities were properly identified. The children have not missed doctor's appointments or therapy sessions since they began their placement with T.W., and many of their issues with appropriate bonding to caregivers, disrespect, and aggressive behavior have been ameliorated.

Both of the children face learning disabilities and mental health issues that initially hindered their progress in school. However, T.W. quickly identified the problems and obtained the proper medical treatment and care for them. The school performance of both children has improved, particularly with the addition of extracurricular activities. Both of the children now play baseball. M.G. also participates in cheerleading and Girl

17

Scouts. T.W. is a volunteer at the school, and has also adjusted her work schedule, so that she is home in the morning before M.G. and A.G. leave for school, and also in the afternoons when they come home, so she can help with their homework and can take them to their after-school practices and activities.

The GAL and DCS officials agree that M.G. and A.G. need permanency, and have needed permanency for a long time. A.G. has been removed from her parents' care for four of the five years of her young life, and M.G. has been removed from her parents for five and one-half of the eight years of her life. M.G. and A.G. had a goodbye visit with their Mother in 2011 when Mother's visitation rights were revoked after poor behavior. M.G. indicated to T.W. that she wants a "forever home," and T.W. has been their constant caregiver since April 2010.

F. *Additional Procedural Facts Pertinent to Appellant's Argument*

The trial court admitted, over Mother and Father's objection, fifty-one exhibits introduced by the guardian ad litem ("GAL"). On appeal, Mother and Father contend that the trial court's admission of GAL exhibits 1-18 was an abuse of its discretion. The exhibits at issue in this appeal include (listed by number and brief description):

1. Informal Adjustment from 1999 between DCS and Mother, regarding Sibling 1 and Sibling 2.
2. Courts' Approval of the 1999 Informal Adjustment.
3. 2003 CHINS petition filed against Mother regarding Sibling 1 and Sibling 2, as well as Mother's deceased third child.
4. 2003 Court Order, wherein Mother admits the CHINS allegations.
5. 2003 Parental Participation Decree for Mother.
6. 2005 CHINS petition filed against Mother and Father regarding M.G. and her siblings.
7. 2005 Court Order finding CHINS petition to be true.
8. 2005 Participation Decree for Mother.

18

9. 2006 CHINS petition filed regarding M.G. and her siblings.
10. 2006 CHINS regarding M.G. and her siblings.
11. 2006 Court Order, wherein Mother admits CHINS.
12. 2006 Parental Participation Decree for Mother.
13. 2006 Court Order for removal of A.G.
14. 2006 CHINS filed regarding A.G.
15. 2006 Court Order on Initial Hearing for TPR between M.G., Sibling 1, Sibling 2, and Sibling 3 and Mother.
16. 2008 Court Order Dismissing the 2006 TPR.
17. 2008 Request for Detention of Mother's children including M.G. and A.G.
18. 2008 Court Order granting Request for Detention of Mother's children.

With respect to exhibits 1-5 and 7-18, Mother raised objections as to relevance. Father also raised objections as to relevance against exhibits 3, 7, 9, 11, 13, 14, 17, and 18. Additionally, Mother raised hearsay objections to exhibits 3, 6, 15, 14 and 17, even though the hearsay portions were redacted from exhibit 14, and the Request for Detention in exhibit 17 was not admitted to prove the truth of the matter asserted therein. Father raised his own hearsay objections with respect to exhibits 3, 6, 10, 14 and 17. Mother also objected on the grounds that the prejudicial effect of exhibits 1 and 10 would outweigh their probative value. Finally, both Father and Mother objected to exhibit 6 on the grounds that it was not a court order.

Father and Mother bring their appeal based on the admission of these particular exhibits because the trial court made the following findings of fact (numbered as in the court's judgment):

3. Three older siblings were, and still are, involved in the CHINS proceedings, but are not part of this termination case. . . .
9. [Mother] has a lengthy substantiated history of cases with, and services through the [DCS Marion County] commencing with an Informal Adjustment in February of 1999 due to illegal substances.

19

10. [Mother's] children were involved in CHINS actions in 2003, 2005, 2006, 2008, and 2009 prior to the CHINS cases filed in 2010 [sic] which has resulted in this termination action

11. Reasons for the CHINS actions included substance abuse, domestic violence and physical abuse on the children. . . .

12. During the prior CHINS cases, [Mother] completed home based counseling, domestic violence classes, substance abuse treatment and psychological evaluation.

34. Mother has a [DCS Marion County] history going back thirteen years based on neglect, abuse and substance abuse.

Appellant's App. pp. 34-36. Mother and Father argue that the court abused its discretion in admitting Exhibits 1-18 because the exhibits support findings related to prior, now-closed CHINS cases, and the documents also contain information regarding Mother's other children, who are unrelated to Father and not listed in the current TPR.

## II. Discussion and Decision

Mother and Father argue that the trial court abused its discretion in admitting the guardian ad litem's ("GAL") exhibits 1-18 at trial. They claim that the court relied in its ruling on those exhibits, resulting in reversible error. This court applies a highly deferential standard of review in cases concerning the termination of parental rights. A.F. v. Marion Cnty. Office of Family and Children, 762 N.E.2d 1244, 1249 (Ind. Ct. App. 2002). "Parental rights are of a constitutional dimension, but the law provides for the termination of those rights when parents are unable or unwilling to meet their parental responsibilities." Id. (citing In re K.S., 750 N.E.2d 832, 836 (Ind. Ct. App. 2001)). "Because the ultimate purpose of the law is to protect the child, the parent-child relationship will give way when it is no longer in the child's interest to maintain this relationship." Id. (citing In re B.D.J., 728 N.E.2d 195, 200 (Ind. Ct. App. 2000)). This court will reverse a trial court's determination as to the admissibility of the evidence only

20

upon a showing of an abuse of discretion. Matter of J.L.V., Jr., 667 N.E.2d 186, 189 (Ind. Ct. App. 1996).

Trial courts have significant discretion in admitting evidence regarding a family's DCS history during proceedings concerning the welfare of children. "A trial court should judge a parent's fitness to care for her children at the time of the termination proceeding, taking into consideration evidence of changed conditions." Matter of D.G., 702 N.E.2d 777, 779 (Ind. Ct. App. 1998) (citing J.K.C. v. Fountain Cnty. Dep't of Pub. Welfare, 470 N.E.2d 88, 90 (Ind. Ct. App. 1984)). Trial courts must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect. Id. Therefore, evidence of a parent's history of criminal conduct, drug and alcohol abuse, neglect, failure to provide support and lack of adequate housing or employment is relevant to a trial court's ruling. See id. (citing Matter of Danforth, 542 N.E.2d 1330, 1330 (Ind. 1989); Matter of M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied; Odom v. Allen Cnty. Dep't of Pub. Welfare, 582 N.E.2d 393, 396 (Ind. Ct. App. 1991); J.K.C., 470 N.E.2d at 91-92).

Additionally, our courts have held that evidence of parents' prior involvement with DCS regarding other children, including CHINS petitions filed on behalf of those children, is admissible as character evidence in both CHINS and TPR proceedings under Indiana Evidence Rule 405. See id. (citing J.L.V., 667 N.E.2d at 191). Rule 405 provides:

> (b) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

21

Ind. Evid. Rule 405(b). A parent's character is at issue in CHINS proceedings as well as in TPR proceedings because a parent's past, present and future ability to care for the child forms the basis for adjudications in such cases, and evidence of a parent's character is an important part of assessing that ability. See id. (citing J.L.V., 667 N.E.2d at 190). Moreover, evidence that a parent continuously failed to develop adequate parenting skills or to improve conditions in the home despite multiple interventions by DCS demonstrates an habitual pattern of conduct. Such a pattern is relevant in determining whether a parent is likely to develop the ability to provide a satisfactory home for her children in the future. See id.

The evidence that Mother and Father challenge on appeal is plainly admissible under Ind. Evid. Rule 405(b) and our deferential standard of review. Simply said, prior CHINS history regarding other children in a family is and should be admissible in the best interests of children who are currently the subject of a CHINS proceeding. Otherwise, the chronicity of parenting that, as here, is so completely inadequate as to seriously endanger children will never be broken. Each of the eighteen exhibits at issue in this appeal is related to DCS intervention or CHINS proceedings involving Mother's other children and/or M.G. and A.G. themselves. These documents clearly demonstrate a pattern of habitual abuse and neglect, and a continued failure to provide adequately for any of Mother's eight children, but more specifically M.G. and A.G. For all of these reasons, we reject Mother's and Father's claims of abuse of discretion in the admission of

22

the documents at issue, and we affirm the trial court's termination of Mother and Father's parental rights.[13]

Affirmed.

BAKER, J., and MAY, J., concur.

---

[13] Mother and Father fail to raise an argument challenging sufficiency of the evidence or any other challenge to the decision below.