**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED
Aug 11 2014, 10:41 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KAREN M. HEARD**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
**ROBERT J. HENKE**
**DAVID E. COREY**
Office of the Indiana Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: T.D. and M.D. (minor children); <br><br> A.D. (Father) <br><br>     Appellant-Respondent, <br><br>         vs. <br><br> THE INDIANA DEPARTMENT OF CHILD SERVICES, <br><br>     Appellee-Petitioner. | ) ) ) ) ) ) )    No. 82A01-1308-JT-344 ) ) ) ) ) ) ) ) |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Brett J. Niemeier, Judge
Cause No. 82D01-1301-JT-3 and 82D01-1301-JT-4

**August 11, 2014**

**PYLE, Judge**

## STATEMENT OF THE CASE

A.D. ("Father") appeals the involuntary termination of his parental rights to his children, T.D. and M.D. (collectively "the children"). Throughout the CHINS proceeding and at the time of the termination hearing, Father did not comply with the parental participation plan he signed and could not secure adequate employment or housing for the children. As a result, the trial court found that the conditions that led to the children's continued removal from Father's care would not be remedied. In addition, the participating service providers testified that termination of Father's parental rights was in the children's best interests. The Department of Child Services ("DCS") presented clear and convincing evidence supporting the termination of Father's parental rights.

We affirm.

## ISSUE

Whether DCS presented clear and convincing evidence to support the termination of Father's parental rights.

## FACTS

T.D. was born on March 10, 2007 and his sister, M.D., was born on March 13, 2011. On April 5, 2011, DCS filed a petition alleging M.D. was a child in need of services ("CHINS") because she was born with THC in her system. T.D. was included in the petition. At a detention hearing on April 12, 2011, Mother admitted that the children

were CHINS and DCS agreed to leave the children in Mother's care as long as her subsequent drug screens were negative. Father was incarcerated in a work release facility at the time the court adjudicated T.D. and M.D. as CHINS. Father eventually appeared at a hearing with counsel, did not object to the children's CHINS finding, and signed a parental participation plan. The parental participation plan required Father to do the following: submit to random drug screens; participate in supervised visits with his children; remain drug and alcohol free; participate in programs during incarceration to improve his parenting skills; and maintain contact with the DCS family case manager. The plan also required Father to secure and maintain "stable housing that is kept safe for the [children]," notify DCS of changes in his personal information and household composition within forty-eight hours, and obey the law. (Ex. Vol. I, Ex. 3A at 110-11).

In June 2011, DCS removed the children from Mother's care after noncompliance with the conditions that had been established as a part of the in-home CHINS proceedings. DCS attempted a trial home visit with Mother, but DCS removed the children from Mother's care again and placed them with relatives because Mother was incarcerated. The children eventually were placed in foster care. Father was still incarcerated at this time and participated in supervised visits with his children, but he did not consistently follow the rules and regulations of the facility. On September 8, 2011, Father's placement in community corrections was revoked, and he was sentenced to the Department of Correction ("DOC"). Father was released from DOC on June 21, 2012.

Before and after his release from prison, Father had difficulty maintaining stable employment and housing. Father worked briefly at Penn Station, Taco Bell, Toyota, and

3

Subway. Father was fired from all of these positions, having worked at each for less than a year. After his release from prison, Father worked for Tom Guggenheim ("Guggenheim"). Father stated that he worked about thirty-six (36) hours per week and earned $13.00 per hour. Guggenheim testified that he hired Father for a temporary project scheduled to last about a month but lasted about two months due to delays. Guggenheim reduced Father's pay from $13.00 per hour to $9.00 per hour because Father brought another person to help on the project, and Guggenheim could not afford to pay both men $13.00 per hour.

Father was evicted from one apartment in late September 2012. On November 28, 2012, Father leased an apartment in the Southwinds apartment complex. Father was not required to pay rent because he reported to Southwinds that he had no income. However, Jamie Eickhoff ("Eickhoff"), site manager at Southwinds, testified that Father never reported his income from his work with Guggenheim. Eickhoff further stated that Father would have to pay back rent and other fees totaling over $1700 to be in good standing with Southwinds and possibly move into a two-bedroom apartment.

Once Father was released from DOC, he resumed weekly visits with T.D. but not M.D. at the offices of Ireland Home Based Services. Father attended three visits and eventually asked twice that the visits be moved to another day to accommodate his work schedule. Father's visits with T.D. were moved from Mondays to Tuesdays, then from Tuesdays to Thursdays. After changing the visitation day, Father failed to show up for visits four times and cancelled visits on six other occasions. The cancelled visits had a very detrimental impact on T.D. When the visits began, T.D. reported to his therapist

4

that he was very excited to see Father and that the visits were going well. When Father would miss visits, T.D.'s behavior would become "increasingly aggressive and destructive." (Ex. Vol. IV Ex. 23 at 43). T.D. blamed his foster parents when Father would miss visits. The court-appointed special advocate, Deborah Gamache ("CASA Gamache"), requested that the visits stop after Father's multiple missed and cancelled visits. Father eventually requested to stop visits with T.D. as well.

Megan Halstead ("Halstead") was a therapist who worked with T.D. to address issues he had in adjusting to being in foster care. As her time with T.D. progressed, Halstead focused on addressing T.D.'s aggressive behavior. Halstead noted that T.D. did well in his foster home when Father was consistently visiting. When Father failed to visit T.D., Halstead observed that T.D.'s aggressive behavior increased. After treatment, Halstead said that T.D. was "doing pretty well." (Tr. 112). T.D. still had tantrums, but these were mostly related to issues with his other siblings.

DCS filed petitions to terminate Father's parental rights to the children on January 1, 2013.[1] The trial court conducted evidentiary hearings on March 12 and 26 and July 3, 2013. Jennifer Hall ("FCM Hall"), the family case manager, testified that of all of the requirements of the parental participation plan Father signed, visitation with T.D. was the only condition in which he took part. FCM Hall testified that she met with Father and spoke with him about complying with the parental participation plan. Father responded that he would be willing to terminate his parental rights to the children. Specifically regarding M.D., Father admitted that he had no bond with her and that he would not be

---

[1] Mother voluntarily terminated her parental rights to the children on December 4, 2012.

able to keep up with all of her required medical appointments.[2]  Father also told FCM Hall that the children were doing well in foster placement and that he would not "win" at a termination hearing.  (Tr. 157).  FCM Hall testified that the children had lived in foster care with their half siblings, that the children had established a strong bond, and that she could not imagine splitting them up.

CASA Gamache filed a report on December 10, 2012.  In her report, she stated that termination of Father's parental rights was in the best interests of the children because "Father has proven he cannot provide the needed financial and housing stability, the dependability that all children need for security, or that he can provide the needed medical attention for his children so [vitally needed] to have a chance of maturing into healthy adulthood."  (Ex. Vol. I., Ex. 3A at 3).  Further, her report stated:

> The children have a great deal of mental health issues, physical and medical care that is needed on a weekly basis.  The foster parents make sure that the children are attending all medical and therapeutic appointments for their special needs.  [M.D.] has a lot of medical issues that require a great deal of occupational and physical therapies for delayed motor and speech skills.  [M.D.]  has been seen at Riley [Hospital] and needs her growth re-check next year since [M.D.] currently has an ½ inch difference from one leg to the other.  These weekly appointments are essential to his children's well-being.  Their medical and therapeutic appointments are critical and cannot be neglected.  [Father] has proved he cannot be bothered to visit with his son once a week; CASA does not want to imagine what would happen to his children if he provides the same care [to] these appointments as he did with his visitations.

*Id.*  On July 3, 2013, the trial court entered its order terminating Father's parental rights.

Father now appeals.  We will provide additional facts as necessary.

---

[2] M.D. sees a therapist three times per week for speech and hearing issues.  According to CASA Gamache's report, these issues were also being monitored by Riley Hospital to determine the extent of her medical issues.

## DECISION

Although parental rights are of a constitutional dimension, the law allows for termination of these rights when parties are unable or unwilling to meet their responsibilities. *In re A.N.J.*, 690 N.E.2d 716, 720 (Ind. Ct. App. 1997). The purpose of termination of parental rights is not to punish parents but to protect children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*.

In reviewing the termination of parental rights, we will neither reweigh the evidence nor judge the credibility of witnesses. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence most favorable to the judgment. *Id*. Where the trial court has entered findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Id*. We must determine whether the evidence supports the findings and then whether the findings support the judgment. *Id*. We will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. A judgment is clearly erroneous if the findings do not support the conclusions or the conclusions do not support the judgment. *Id*.

When DCS seeks to terminate parental rights pursuant to INDIANA CODE § 31-35-2-4(b)(2), it must plead and prove, in relevant part:

\* \* \* \*

(B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside of the home of the parents will not be remedied.

7

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has on two (2) separate occasions, been adjudicated a child in need of services.

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Because subsection (b)(2)(B) is written in the disjunctive, DCS need prove only one of the three elements by clear and convincing evidence. *See Bester v. Lake Cnty. Office of Family and Children*, 839 N.E.2d 143, 153 n.5 (Ind. 2005). These allegations must be established by clear and convincing evidence. *I.A.*, 934 N.E.2d at 1133. If the trial court finds the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8(a).

Father argues that DCS did not establish the following: (1) that he would not remedy the conditions requiring the children's continued placement outside of his care; (2) that a continuation of the parent-child relationship posed a threat to the children's well-being; (3) that termination of his parental rights was in the best interests of the children; and (4) there is a satisfactory plan for the care and treatment of the children.

1. Conditions Remedied

Father argues that DCS did not present clear and convincing evidence that he would not remedy the conditions resulting in the removal or continued placement of the children outside of his care. Father essentially claims that he remedied the conditions resulting in the children's removal or continued placement from his care because he was

8

out of prison, living in a one bedroom apartment, and employed at the time of the termination hearing.

To determine whether a reasonable probability exists that the conditions justifying a child's continued placement outside of the home will not be remedied, the trial court must judge a parent's fitness to care for the child at the time of the termination hearing, taking into consideration any evidence of changed conditions. *A.N.J.*, 690 N.E.2d at 721. The trial court must also evaluate the parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* A trial court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family and Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 1999). Additionally, the trial court can properly consider the services offered by DCS to the parent and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* "DCS need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

We note that the children were initially removed from Mother's care for noncompliance with the in-home CHINS proceeding and were finally placed in foster care after Mother was arrested during a trial home visit. Father's incarceration in a work release facility at the time of the CHINS finding was the reason the children could not be placed in his care. We further acknowledge that at the time of the termination hearing,

Father was out of prison, living in an apartment, and working a job. Yet, Father was evicted from one apartment, and it appears he was only able to secure another apartment rent free because he lied to the property manager about his income. In addition, Father's job with Guggenheim was temporary in nature, and Father had not maintained any of his other stated jobs for more than a year. Finally, of thirteen scheduled weekly visits with T.D., Father only attended three visits even after visit days were changed multiple times to accommodate his work schedule. It was not unreasonable for CASA Gamache to question Father's ability to consistently take his children to therapy and doctor appointments if he could not consistently visit T.D. one day a week. This evidence supports the trial court's conclusion that "[w]hile at first glance it might appear that the father has rehabilitated himself after he has been released from prison, there are still too many inconsistencies and unstableness which cannot be over looked." (App. 12). Accordingly, DCS established that there was a reasonable probability that Father's behavior would not change. *See, e.g.*, *Kay.L.*, 867 N.E.2d at 242.[3]

## 2. Best Interests

For the "best interests of the child" statutory element, the trial court is required to consider the totality of the evidence and determine whether custody by the parent is wholly inadequate for the child's future physical, mental, and social growth. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. denied*. In making this determination, the trial court must subordinate the interest of the parent to that of the child involved. *Id.* The recommendations of the service providers that parental rights be terminated support a

---

[3] Again, because I.C. 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not address whether continuation of the parent-child relationship poses a threat to the children's well-being.

10

finding that termination of parental rights is in the child's best interests. *See A. J. v. Marion Cnty. Office of Family and Children*, 881 N.E.2d 706, 718 (Ind. Ct. App. 2008), *trans. denied*.

Father argues that the trial court ignored the totality of the evidence in reaching its conclusion and that he should be given a reasonable opportunity to reunite with his children. The totality of the evidence shows termination of Father's parental rights was in the best interests of the children. Both CASA Gamache and FCM Hall testified that termination of Father's parental rights was in the best interests of the children because of his inability to provide a stable home and income. In addition, his failure to visit consistently with the children reasonably supported CASA Gamache's concerns about Father's dependability in meeting the needs of the children. This testimony, in addition to the evidence previously reviewed, supports the trial court's determination that termination of Father's parental rights was in the best interests of the children. *See In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of caseworkers, together with evidence that the conditions resulting in placement outside of the home will not be remedied, was sufficient to prove by clear and convincing evidence that termination of parental rights was in child's best interest).

3. Satisfactory Plan

Finally, Father argues that DCS failed to prove by clear and convincing evidence that a satisfactory plan was in place for the children. However, Father acknowledges in his brief that DCS presented testimony that the plan for the children was adoption. Precedent does not require DCS to state a more detailed plan. *JKC v. Fountain Cnty.*

11

*DPW*, 470 N.E.2d 88 (Ind. Ct. App. 1984); *In re B.D.J.*, 728 N.E.2d 195 (Ind. Ct. App. 2000) (plan for adoption of a child in need of services may satisfy statutory obligation to have a satisfactory plan in place). Father cites no authority requiring DCS to present a more detailed plan. Accordingly, the trial court properly found that DCS met its obligation of having a satisfactory plan in place for the care of the children.

DCS presented clear and convincing evidence supporting the termination of Father's parental rights to T.D. and M.D.

Affirmed.

FRIEDLANDER, J., and MATHIAS, J., concur.