FILED

Feb 24 2020, 5:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Jennifer A. Joas
Madison, Indiana

ATTORNEYS FOR APPELLEE:
INDIANA DEPARTMENT OF
CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of: L.H. (Minor Child), <br><br> and <br><br> E.H. (Father), <br> *Appellant-Respondent,* <br><br> v. <br><br> The Indiana Department of Child Services, <br> *Appellee-Petitioner.* | February 24, 2020 <br><br> Court of Appeals Case No. 19A-JT-1969 <br><br> Appeal from the Dearborn Circuit Court <br><br> The Honorable James D. Humphrey, Judge <br><br> Trial Court Cause No. 15C01-1904-JT-10 |

**Tavitas, Judge.**

## Case Summary

E.H. ("Father") appeals the termination of his parental rights to L.H. (the "Child"). Due to the Department of Child Services' ("DCS") procedural error, which tainted the entire proceeding, we reverse and remand.

## Issue

Father raises one issue on appeal, which we restate as whether the termination of Father's parental rights was improper in light of the DCS's requirement that Father comply with the Interstate Compact on the Placement of Children ("ICPC").

## Facts

The Child was born in June 2016 to A.C. ("Mother") and Father. Soon after the Child's birth, Father moved to Florida to live with his parents. Father planned to move Mother and the Child to Florida once he got on his feet. In November 2016, Father was living in Florida with his other child, the Child's sibling, and Mother was living in Indiana with the Child and Mother's other children. Mother was removed from a homeless shelter and had no housing. Mother contacted DCS and admitted that she was unable to care for the Child and Mother's other children due to her homelessness. Accordingly, on November 17, 2016, DCS filed a petition that the Child was a child in need of services ("CHINS").

The CHINS petition alleged:

A. Mother, [ ], was kicked out of Heart House, a homeless shelter, and admitted to not having a place to go.

B. Mother refused to request assistance from family.

C. Mother agreed to voluntarily have her children detained to ensure their basic needs were met.

\* \* \* \* \*

E. The biological father of child, [ ], is [Father], who currently resides in Florida.

Pet. Ex. 1.

Father sought custody of the Child when DCS filed the CHINS petition. Candice Lackman, a family case manager ("FCM") supervisor with DCS, citing DCS's policy, instructed Father that a home inspection in accordance with the ICPC was required before the Child could be placed with him. Lackman was uncertain how long it would take the State of Florida to complete the inspection of Father's home, but once Lackman submitted the paperwork, the timing would be determined by Florida's process. Lackman sent the ICPC documents on November 23, 2016, to DCS's Indianapolis office for processing and submission to Florida.

With Father's home inspection still not completed, the Child was adjudicated a CHINS on December 29, 2016. In the order on the CHINS fact finding hearing, the trial court ordered DCS "to submit an ICPC for father." State's

Ex. 3. Pursuant to the trial court's dispositional decree, entered on January 25, 2017, Father was ordered to: keep in touch with the FCM weekly; participate in the programs recommended by DCS; maintain suitable, safe, and stable housing; not use, consume, manufacture, trade, distribute, or sell any illegal substances; and attend all scheduled visitations.

[7] On March 15, 2017, Lackman received a letter from Florida notifying Lackman that they were unable to complete the ICPC process because Father advised Florida, in early March, that he would be returning to Indiana. Father returned to Indiana sometime in March 2017 and began staying with an individual identified by DCS as having substance abuse issues.

[8] While in Indiana, Father participated in some, but not all, services. On April 9, 2019, DCS filed a petition for involuntary termination of Father's parental rights. On June 27, 2019, the trial court held a termination fact finding hearing. At the termination hearing, witnesses testified to the foregoing facts.

[9] Former FCMs Nathalia Beam and Jenna Craig, who worked on Father's case, testified they had concerns regarding Father's: (1) ability to provide adequate attention to the Child; (2) financial situation; (3) housing situation; and (4) drug use. Although acknowledging that the Child was not placed with Father because Father was in Florida, FCM Beam testified that the conditions that led to the Child's removal have not yet been remedied and agreed with DCS's request to terminate Father's parental rights. When asked if FCM Craig follows DCS policy over the law, FCM Craig stated: "I know that I have to

follow policy. I do not know what the law states." Tr. Vol. II p. 87. In addition, Candice Lackman, FCM supervisor, testified as follows on cross-examination by Father's counsel:

> Q. So, what crime or act of neglect or whatever did the father do that didn't justify the Department immediately giving him custody of his child?
>
> A. We attempted to do the ICPC process to place the children down in Florida with him.
>
> Q. Are you aware that that [sic] ICPC is not required?
>
> A. These – Florida is required to notify – to be notified of any placement in that state and if they're –
>
> Q. I'm saying, are you aware that you – your department did not have to go through this step?
>
> A. It is part of our policy.
>
> Q. So, is that the end and beginning of everything? As long as its policy there's no – that's the end of it, you don't look to see if it's wise in once [sic] case or another?
>
> A. I have to follow the policies of my position.

*Id.* at 126-27.

[10]     FCM Beam, similarly, testified on cross-examination by Father's counsel:

Q. And then you said your other concern was unstable housing. Didn't he in fact have stable housing in Florida?

A. I believe so. We were never able to do a home check of the home to verify if the child would be able to be placed there.

Q. But it could have been verified immediately, correct?

A. Not immediately.

Q. Virtually immediately.

A. We have to go through the ICPC process and that can take some time.

Q. But you didn't have to go through that process, correct?

A. We do.

Q. And you've been here the whole time. We've established the fact that that's [sic] just policy, that's not the law, correct?

A. Then we have to abide by policy.

*Id.* at 150-51.

[11]     Father testified at the termination fact finding hearing that he left the Child's sibling at home in Florida with his parents to return to Indiana. Father testified the original plan was to move to Florida and become established. The Child and Mother were going to join Father and the Child's sibling in Florida once he

was established. After discovering that Mother turned the Child over to DCS, Father sought to obtain custody of the Child; however, DCS told Father that, because he was out of state, a home inspection was required before the Child could be placed with Father. Father testified that he moved back to Indiana to regain custody of the Child.

[12] On July 26, 2019, the trial court entered an order terminating Father's parental rights to the Child. Father does not contest the trial court's findings, which conclude:

> f. Under the dispositional decree, [Father] was ordered to remain in contact with the Department, notify the Department of any changes of address, participate in any recommended programs, secure and maintain suitable housing, refrain from using illegal substances, and attend all scheduled visitation. At the time of the dispositional decree, father was still residing in Florida.

> g. The Department attempted to place father's child with him by submitting an Interstate Compact for the Placement of Children (hereinafter "ICPC") to the State of Florida. Family Case Manager Supervisor Candice Lackman testified that she was the [FCM] for the family from November 2016 to September 2017. FCM Lackman further testified that she sent all relevant documents for the ICPC to Indianapolis in late November 2016 or December 2016 and that after sending those documents, she had no control of how long Florida took to complete the ICPC. FCM Lackman also testified that in March 2017, she received a letter from Florida stating that a home study of father's home was not completed, due to father moving to Indiana. (Exhibit 21)

h. Upon father's relocation to Indiana, he requested that his parents care for another daughter, whom he had left in Florida. As of the termination hearing, father's parents have been caring for his daughter for approximately two (2) years. Father was reminded of his responsibilities per the dispositional decree, including him finding suitable housing. Upon father's relocation, father began residing with someone who had substance abuse issues and had a CHINS proceeding pending before the Court. The Department informed father that this was considered inappropriate housing and that his child would not be placed with father should he continue to reside at that house.

i. In July 2017, the Court modified father's dispositional decree, following a motion filed by the Department. Father had been voluntarily submitting random drug screens, and he had tested positive for THC. He was also having some issues with the Department's service provider, Redwood Toxicology and had not submitted to a substance abuse evaluation. The Court ordered that father submit to random drug screens and submit to a substance abuse evaluation. (Exhibits 7 and 8)

j. Father has completed said substance abuse evaluation, with a recommendation that father complete Confidence to Change to address his substance use. Father failed to complete Confidence to Change, despite being informed by the FCM assigned to the case of the recommendation. Father also continued to submit to random drug screens through Forensic Fluids and Redwood Toxicology. His compliance became more sporadic as the case progressed. Father last submitted to a drug screen for Redwood Toxicology on February 4, 2019, which was negative for illegal substances. His last drug screen with Forensic Fluids was January 16, 2019, which was positive for THC. No drug screens have been collected from father through either company since February 4, 2019. The referral for those screens continued to be active and resubmitted every month. (Exhibits 18-20)

k. Father has worked with several service providers throughout the case. Robin Gibbs, from Bridges Counseling and Family Services, supervised Visits between December 2016 and April 2017. Father attended two (2) visits in December 2016 and one (1) Visit on January 18, 2017. Ms. Gibbs had no contact with father until late March 2017 and she attempted contact with him throughout April 2017[] but was unsuccessful. Visits should have occurred twice per week, which did not occur.

l. Karen Duquette, with Ireland Home Based Services, worked with father on Father Engagement and issues with father's driver's license. Father had to work with Ms. Duquette because his referral for parenting education through Bridges Counseling was cancelled for lack of contact. He did complete Father Engagement, but made minimal progress in obtaining his driver's license, which he has been working on since October 2018. Ms. Duquette testified that she worked with father to get all necessary paperwork and provided him with some of the information twice. As of the date of the hearing, father still does not have his driver's license, and he has lived in at least three (3) different residences since Ms. Duquette began working with him.

m. Debra Sinclair, also with Ireland Home Based Services, supervised visits from November 2018 to January 2019 and worked as a home-based therapist. The visits were once per week, and she had to implement a call-ahead plan, as there were consistency issues almost immediately. Father attended seven (7) visits during that period and he was living with mother in an apartment. Ms. Sinclair testified that both parents would sometimes arrive late or leave the visits early. On one occasion the parents left early to buy cigarettes.

n. Melanie Thomas, with Community Mental Health Center, supervised visitation between January 2019 and April 2019. The visits were once per week and lasted two (2) hours. Father was offered twelve (12) visits and missed four (4). Father was

expected to provide dinner and diapers for [the Child] during those visits; of the eight (8) visits father attended, he was unable to provide dinner or diapers for five (5) visits. Father noted a lack of funds for failing to provide for his son. His last visit was in late April 2019.

Appellant's App. Vol. II pp. 25-27. Father now appeals. [1]

## Analysis

Father appeals the termination of his parental rights; however, Father "does not challenge either the findings or specific conclusions, but contends the termination order must be reversed [due to the] tainted [ ] proceedings." Appellant's Br. p. 13. We agree.

The Fourteenth Amendment to the United States Constitution protects the "fundamental right to family integrity" against unwarranted government intrusion. *In re S.A.*, 15 N.E.3d 602, 607-08 (Ind. Ct. App. 2014) (citations and quotations omitted), *clarified on reh'g*, 27 N.E.3d 287 (Ind. Ct. App. 2015), *trans. denied*. This protection encompasses parents' fundamental right to "direct[ ] the care, custody, and control of their children." *Id*. However, a parent's rights are not absolute. *Id*. Acting under its parens patriae power, the State may interfere with parental autonomy when it is "necessary to protect the health and safety of children." *Id*. A parent's right to raise one's children is protected by due

---

[1] Mother voluntarily relinquished her parental rights to the Child at the termination fact finding hearing on June 27, 2019, and does not appeal. Accordingly, our decision will focus on facts related to Father.

process. *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 194 (Ind. Ct. App. 2003).

[15]    The nature of the process due in parental rights termination proceedings turns on a balancing of the "three distinct factors" specified in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S. Ct. 893, 903, 47 L.Ed.2d 18 (1976): the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure. *Santosky v. Kramer,* 455 U.S. 745, 754, 102 S. Ct. 1388, 1395, 71 L.Ed.2d 599 (1982). Finally, we must keep in mind the general proposition that if the State imparts a due process right, then it must give that right. *City of Mitchell v. Graves,* 612 N.E.2d 149, 152 (Ind.Ct.App.1993).

*A.P. v. Porter Cty. Office of Family & Children*, 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000).

[16]    Father's specific argument is that DCS's failure to place the Child with Father, and requiring Father to complete the ICPC process, which is not required for natural parents, was a procedural error that resulted in the improper termination of Father's parental rights to the Child.[2] At the time of the trial

---

[2] DCS argues that Father waived this argument by not raising it below. In his opening statement at the termination fact finding hearing, Father's attorney stated:

> The evidence will show that the Department, in spite of the fact that it's not necessary for a parent to have an interstate compact done, never the less [sic], refused to give him custody of his child. And this was at a point in time where the Department had absolutely no reason whatsoever to believe that he was not capable of safely taking care of this child. The evidence will show that the Department just assumed that because of their protocols, their rules, which we will argue were unconstitutional, . . . that a parent has to prove that they can take care of a child before they can have custody of their child.

court's order on the CHINS fact finding hearing on or about December 2016, which ordered DCS to submit the ICPC process for Father, and DCS's insistence that Father comply with the ICPC, this Court had already handed down *In re D.B.,* 43 N.E.3d 599, 604 (Ind. Ct. App. 2015), *trans. denied.* There, a panel of this Court held "that the ICPC does not apply to placement with an out-of-state parent." *Id.* In its brief, DCS argues that at the time Father was required to comply with the ICPC, "the question of whether ICPC did not apply to a parent in every circumstances [sic] arguabl[y] remained unclear." Appellee's Br. p. 29. We disagree. The majority opinion was the law, and DCS and the trial court were required to comply with that law. *See Matter of M.W.,* 130 N.E.3d 114, 116 (Ind. Ct. App. 2019) ("The decisions of this Court are binding upon trial courts.").[3]

[17] Following *D.B.,* this Court has consistently held that the ICPC does not apply to natural parents. *See Matter of B.L.P.,* 91 N.E.3d 625, 631 (Ind. Ct. App. 2018) ("So, yet again, we hold as plainly and unambiguously as possible: unless and until the statute is amended, the ICPC does not apply to placement with an out-of-state parent."); *see also M.W.,* 130 N.E.3d at 116 ("This Court has made clear

---

Tr. Vol. II p. 7. Father also attempted to ask more than one witness questions on this topic. While better practice would have been to object earlier in the CHINS proceedings, we will address Father's arguments on their merits.

[3] In *M.W.,* the trial court acknowledged that the ICPC did not apply to parents, finding: "The Court is well aware of the Appellate Court's position on an ICPC and respectfully disagrees with their position." *M.W.,* 130 N.E.3d at 115. Although, here, there is no evidence in the record that the trial court was aware of this Court's mandate and chose to ignore it, we note that the trial court did order Father to participate in the ICPC process.

that the ICPC does not apply to placement with an out-of-state parent."); *see also Matter of A.R.,* 110 N.E.3d 387, 391 (n.3) (Ind. Ct. App. 2018) (noting this Court's opinion that the ICPC does not apply to placement with an out-of-state-parent, and the ICPC "only applies to the placement of a child in foster care or as a preliminary to a possible adoption").

[18] DCS continually reaffirmed that its policy required Father to comply with the ICPC, despite our prior ruling that an ICPC is not required for natural parents. Importantly, DCS testified at the fact finding hearing that it was *still* DCS's policy to require an ICPC for a parent.[4] We are dismayed that DCS fails to understand the law regarding the ICPC's inapplicability to natural parents, or, assuming DCS understands the law, DCS has chosen to ignore it. We find it unconscionable that DCS continues to require an ICPC for natural parents despite our Court's reiteration that an ICPC is not required for natural parents. The law on this issue is well-settled. On cross examination in this case, the DCS case workers stated that compliance with the ICPC—even for out of state parents—is their policy. DCS, however, does not have the authority to set policy inconsistent with the law, and DCS is reminded that it cannot ignore the law and must set policy based upon the law.

[19] We now address Father's argument that requiring Father to comply with the ICPC improperly infected the termination proceedings. Turning to the

---

[4] The trial court ordered DCS to complete the ICPC for Father on or about December 2016. The termination fact finding hearing was held in 2019.

*Matthews* factors, DCS's procedural error tainted the proceedings so significantly that we cannot say that Father was afforded his due process rights in the CHINS and termination proceedings.

As to the first factor, it is undisputed that parental rights are among the most fundamental of interests. *See Troxel v. Granville,* 530 U.S. 57, 64, 120 S. Ct. 2054, 2059 (2000) ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court.").

Second, as to the risk of error, the trial court's termination order demonstrates how significant the failure to place the Child with Father was in these proceedings. The trial court's order makes several references to Father's lack of bond with the Child. Specifically, the trial court concludes in part that: DCS "attempted to place father's child with him by submitting an [ICPC] to the State of Florida"; Stacey Cornett, a therapist with Community Mental Health Center, testified that she has "serious concerns with removing [the Child] from his foster parents' care, as he is incredibly susceptible to being re-traumatized and is vulnerable to change"; Cornett "cannot determine if father has a bond with [the Child] or if there is a relationship between the two"; "[r]eturning the child to his father, after being in a caring and loving foster home for over three (3) years, will cause the child extensive trauma"; "father has no real relationship with his son"; and "Father has not been a constant or positive figure in [the Child's] life for over three (3) years." Appellant's App. Vol. II pp. 25-28.

[22]    We cannot overlook these findings as Father's lack of bond with the Child is no doubt due, in part, if not entirely, to DCS's failure to initially place the Child with Father.  The fact that the trial court put so much emphasis on this lack of bond, demonstrates to us that this error by DCS was a significant, contributing factor in the termination of Father's parental rights.

[23]    Finally, as to the third factor regarding the governmental interests involved, while we agree that the State has the authority to act under its parens patriae power, this is only allowed when use of that power is necessary.  DCS cannot merely choose another caretaker for the Child when the Child already has a parent willing and able to care for the Child.  DCS does not get to hand select parents for the children of this State by not following the law.  It appears, here, that is the course DCS took.  *See Carrera v. Allen Cty Office of Family and Children,* 758 N.E.2d 592, 595 (Ind. Ct. App. 2001) ("Children are not removed from the custody of their parents just because there is a better place for them, but because the situation while in the custody of their parents is wholly inadequate for their survival.") (quotations omitted); *see also In re C.C.,* 788 N.E.2d 847, 855 (Ind. Ct. App. 2003), *trans. denied.*

[24]    Based on the foregoing, we believe that DCS's procedural error robbed Father of his due process rights and tainted the proceedings in the termination of Father's parental rights.  *See A.P.,* 634 N.E.2d at 1112-13 ("procedural irregularities in a CHINS proceeding[] may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights"); *see also Matter of C.M.S.T.,* 111 N.E.3d 207, 212 (Ind. Ct. App.

2018) ("We cannot agree that the egregious behavior of some of the DCS employees did not contribute to Mother's and Father's non-compliance with some services.").

[25] It is not lost upon us the impact that our decision will have on the Child. We, like DCS, and the trial court, are bound by the law. We are now put in the difficult position to reverse the trial court's order because Father was not given his procedural due process rights. Our sincere hope is that, in the future, DCS and the trial court will comply with the law to prevent the need for a decision such as this. We reverse and remand with instructions that the trial court vacate the order terminating Father's parental rights and proceed consistent with this opinion.

## Conclusion

[26] DCS's erroneous decision to require Father to comply with the ICPC violated Father's due process rights and tainted the termination proceedings. We reverse and remand.

[27] Reversed and remanded.

Najam, J., and Vaidik, J., concur.